IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Georgia Atlas, Inc., and
Atlas Illinois, Inc.,

    Plaintiffs,

v.

Andrew L. Turnage, in his Official
Capacity as Executive Director of the
Georgia Access to Medical
Cannabis Commission, and Christopher
Edwards in his Official Capacity as
Commissioner of the Georgia Access to
Medical Cannabis Commission

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION FILE
NO.: 1:21-CV-03520-SDG

ORAL ARGUMENT REQUESTED

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65, Plaintiffs move this Court for a Preliminary Injunction enjoining Defendants' further implementation of the Hope Act using the residency requirement, because said residency requirement violates the dormant Commerce Clause of the United States Constitution, and was arbitrarily and capriciously used by the Defendants to determine the presumptive winners of the licenses under the Hope Act, in violation of the Plaintiffs' equal protection and due process rights. And in furtherance of this Motion, Plaintiffs show the Court as follows:

## STATEMENT OF UNDISPUTED FACTS

On April 2, 2019, the Georgia General Assembly passed House Bill 324 titled "Georgia's Hope Act" (the "Hope Act"), which created and authorized the Georgia Access to Medical Cannabis Commission to oversee the licensing of limited in-state cultivation, production, manufacturing, and sale of low THC oil to registered patients on the state's low THC oil registry.

The governor signed the Hope Act into law on April 17, 2019.  Georgia's Hope Act (Official Code of Georgia Annotated §16-12) took effect July 1, 2019 and administratively attached the GAMCC to the Office of the Georgia Secretary of State.  See O.C. G. A. § 16-12-202, §50-4-3.

Of particular import here, O.C.G.A. §16-12-211(b) states in relevant part:

> Class 1 production licenses shall be issued to applicants selected by the commission
> following a competitive application and review process in accordance with the
> requirements set forth in this part. An applicant must be a Georgia corporation or
> entity and shall maintain a bank account with a bank or credit union located in this
> state.

Similarly, O.C.G.A. §16-12-212(b) states:

> Class 2 production licenses shall be issued to applicants selected by the commission
> following a competitive application and review process in accordance with the
> requirements set forth in this part. An applicant must be a Georgia corporation or
> entity and shall maintain a bank account with a bank or credit union located in this
> state.

Accordingly, a prerequisite for obtaining either a Class 1 or 2 license is Georgia residency, as well as, maintaining a bank account in a Georgia based bank.

Plaintiffs, which were originally a single company, split into Atlas Illinois and Georgia Atlas[1], and Georgia Atlas applied for a license under the Hope Act, because its sister corporation, Plaintiff Atlas Illinois, could not.  Compliance with the Hope Act's residency requirement was costly and burdensome to the Plaintiffs in terms of building two separate corporate structures, and would not have been executed but for the Hope Act's residency requirement.

In July of 2021, the Defendants issued a Notice of Intent to Award ("NOI"), wherein the presumptive license recipients were identified.  And at that time, it became clear that the residency

---

[1] Georgia Atlas was formed on October 31, 2019.

requirement was not just unconstitutional, but a farce – as (i) the overwhelming majority of the winners were recently created offshoots of larger multistate enterprises,[2] and (ii) the scoring on the residency part of the applications appears to have been arbitrary – with several winners forming their Georgia branch literally days before, and in some cases, after the original application deadline; moreover, despite residency being a rather straightforward and objective criterion, the Defendants' scoring of the residency requirement for the license applications varied wildly despite the same documentation for residency being filed by all applicants.[3] Lastly, such inconsistencies on the residency, as well as -- presumptively -- on other application criteria, were deterministic for sorting applicants for licenses under the Hope Act. Plaintiffs now challenge the constitutional validity of the Hope Act's residency requirement.

## I.      Legal standard for a Preliminary Injunction

A district court should enter a preliminary injunction when a movant shows "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011). "Furthermore, where injunctive relief is sought from irreparable injury arising in the context of state civil proceedings, 'the relief sought [is] of course the kind that raises

---

[2] Initially, the applications for the Hope Act were due on December 23, 2020. Treevana was formed 12/7/2020, Theratrue was formed 10/7/2020, Trulieve was effectively formed 12/28/2020, and Natures was formed 12/3/2020. See Exhibit A – Georgia Secretary of State's Information Pages for Certain Winners.

[3] Despite the fact that Schedule D2 explicitly asks for the same three documents from every applicant, the scores on the residency question varied despite applicants submitting the exact same documents. For example, both Windflower GA, LLC and ACC, LLC received less than full marks, despite submitting the same documents as the Plaintiffs. See Exhibit B – Excerpts from Select Protests related to Scoring for Schedule D2.

no special problem—an injunction against allegedly unconstitutional state action . . . that is not part of a criminal prosecution.'" Cate v. Oldham, 707 F.2d 1176, 1189 (11th Cir. 1983) (citing Younger v. Harris, 401 U.S. 37, 47 n.4 (1971)).

### A. Plaintiffs will suffer irreparable harm if their motion is not granted.

"An injury is irreparable 'if it cannot be undone through monetary remedies.'" Scott v. Roberts, 612 F.3d 1279, 1295 (11th Cir. 2010) (citing Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir.1987)). "Even when a later money judgment might undo an alleged injury, the alleged injury is irreparable if damages would be difficult or impossible to calculate." Id. (internal quotations and citation omitted).

The Eleventh Circuit presumes irreparable injury where violation of a constitutional right causes intangible (i.e., non-economic) injury. See Scott v. Roberts, 612 F.3d 1279, 1295; Siegel v. LePore, 234 F.3d 1163, 1177–78 (11th Cir. 2000) (irreparable injury presumed from violation of a constitutional right to privacy or speech); see also Am. Civil Liberties Union v. Clapper, 804 F.3d 617, 622 (2d Cir. 2015) ("[I]rreparable harm is presumed where there is an alleged deprivation of constitutional rights."). Following that guidance, Eleventh Circuit courts "have held that the very violation of certain fundamental constitutional rights can satisfy the irreparable harm requirement in obtaining preliminary injunctive relief . . . ." Cunningham v. Adams, 808 F.2d 815, 822. See, e.g., Roundtree v. U.S. Dep't of Hous. & Urban Dev., 2009 WL 7414663, at *7 (M.D. Fla. Aug. 28, 2009) ("Plaintiffs will then face eviction (or, at least, the legal prospect of it), and the loss of a constitutionally protected right. This is clearly an irreparable harm."); State of Alabama v. U.S.E.P.A.,1988 WL 156726, at *4 (M.D. Ala. Oct. 21, 1988) (state action would deprive plaintiffs of "their constitutional rights of due process of law under the Fifth Amendment to the United States Constitution. Based upon such a deprivation, the Plaintiffs are threatened with

irreparable harm for which there is no remedy, but for the action of this Court.'"). Moreover, because monetary damage claims are generally barred by the Eleventh Amendment, irreparable harm is presumed so long as the injury itself is not speculative. See Alden v. Maine, 527 U.S. 706 (1999), Iowa Utils. Bd. v. FCC, 109 F.3d 418, 426 (8th Cir. 1996).

Accordingly, in the absence of preliminary injunctive relief, Plaintiffs have, and will suffer, both economic and non-economic harm due to the violation of Plaintiffs' constitutional right to equal protection and due process caused by the Defendants' pending and wrongful denial of a license to the Plaintiffs. Indeed, but for the residency requirement, the Plaintiffs would not have had to spread their limited resources and personnel across two different entities, thus, reducing the likelihood of success on the Hope Act application. And even within the context of the residency requirement, the Defendants arbitrarily and capriciously applied the objective criterion – so that the proposed award of licenses is tainted and patently unfair. Indeed, the Defendants appear to have treated applicants formed days before the application deadline, the same as applicants who had been in existence for over a year.

**B.   Plaintiffs are substantially likely to prevail on the merits of their claim that the Hope Act's residency requirement violates the Dormant Commerce Clause.**

The Commerce Clause empowers Congress "[t]o regulate commerce . . . among the Several States." U.S. Const. art. 1, § 8, cl. 3; see also Dep't of Re venue of Ky. v. Davis, 553 U.S. 328, 337 (2008). The dormant commerce clause is the negative implication of the Commerce Clause: It prohibits states from enacting laws "that discriminate or unduly burden interstate commerce." South Dakota Farm Bureau, Inc. v. Hazeltine, 340 F.3d 583, 592 (8th Cir. 2003) (citing Quill Corp. v. North Dakota, 504 U.S. 298, 312 (1992)). State laws violate the dormant commerce clause if they require differential treatment of in-state and out-of-state economic actors that benefits the former and burdens the latter -- unless the regulation is narrowly tailored to advance a legitimate

local interest. Oregon Waste Sys., Inc. v. Dep't of Env'l Quality, 511 U.S. 93, 999 (1994).

Recently, several federal courts have applied the dormant commerce clause to marijuana facilities regulated by states that have legalized or partially legalized the drug despite the fact that it remains a controlled substance under federal law. See NPG, LLC v. City of Portland, Maine, 2020 WL 4741913 (D. Me. Mar 3, 2020); South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87-88 (1984) (holding the Controlled Substances Act did not grant states the power to burden interstate commerce in substances regulated under the Act).

A state law is considered facially discriminatory when it discriminates against out-of-state interests by its plain terms. See Chem. Waste Mgm't, Inc. v. Hunt, 504 U.S. 334, 342 (1992) (characterizing as facially discriminatory an Alabama law that assessed a surcharge for disposal of hazardous waste that was generated outside of state). A law may also be considered discriminatory if it has a discriminatory purpose or a discriminatory effect, even if it is neutral on its face. See Bacchus Imports, Ltd. v. Dias, 468 U.S. 263, 270 (1984) (discriminatory purpose); Maine v. Taylor, 477 U.S. 131, 148 n. 19 (1986) (discriminatory effect).

A state law that discriminates against interstate commerce is subject to a "virtually per se rule of invalidity," and can stand only if it survives strict scrutiny. Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992). "[A] state law may discriminate against interstate commerce either on its face or in practical effect." Comptroller of Treasury of Md. v. Wynne, 135 S. Ct. 1787, 1805 (2015). Either way, it remains subject to the same "virtually per se rule of invalidity." See, e.g., Maine v. Taylor, 477 U.S. 131, 138 (1986) (strict scrutiny triggered "once a state law is shown to discriminate against interstate commerce either on its face or in practical effect"); Hughes v. Oklahoma, 441 U.S. 322, 336 (1979) (strict scrutiny triggered when the state statute "discriminates against interstate commerce either on its face or in practical effect").

If the challenged law is found to be discriminatory it is *per se* invalid, and the court moves to the second step of its analysis where it considers whether the state can show that "it is narrowly tailored to advance a legitimate local purpose." Tenn. Wine & Spirits Retailers Ass'n v. Thomas, 139 S. Ct. 2449, 2461 (2019) (internal quotations omitted); *see also* South Dakota v. Wayfair, Inc., 138 S. Ct. 2080, 2091 (2018) (quoting Granholm v. Heald, 544 U.S. 460, 476 (2005)) ("State laws that discriminate against interstate commerce face a 'virtually per se rule of invalidity.'")

Here, the Hope Act is discriminatory on its face, and to survive the resulting presumption of invalidity, Granholm, 544 U.S. at 476, the Defendants must show the law advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives. Davis, 553 U.S. at 338 (internal citations committed). These justifications must survive strict scrutiny. Oregon Waste Sys., Inc., 511 U.S. at 101. This is an exceptionally high burden that has rarely been met – in fact, in the few times that the issue has arisen in federal courts, the statute has been enjoined or struck down. See NPG LLC et al v. City of Portland, Docket No.: 2:20-cv-00208-NT (D.Me., August 14, 2020); Lowe v. City of Detroit, Civil Action No. 21-CV-10709 (E.D. Mich. Jun. 17, 2021); Toigo v. Department of Health and Senior Services, et al., Docket No.: 2:2020-cv-04243 (W.D. Mo., December 11, 2020) – all three are attached hereto as Exhibit C. Accordingly, there is an exceptionally high probability that Plaintiffs prevail on its dormant Commerce Clause challenge to the Hope Act.

## C.   The balance of equities and public interest weigh in Plaintiffs' favor.

The final two criteria for the imposition of an injunction – the hardship balance between the parties and the public interest – merge when the the state is the opposing party. See Nken v. Holder, 556 U.S. 418, 435 (2009) (harm to opposing party and public interest merge when government is party). First and foremost, given the fairly obvious unconstitutionality of the

residency requirement in the Hope Act, it is clear that the public interest is not served by the further implementation of a patently unconstitutional law. Conversely, Plaintiff has conditionally been denied a license based on, at least one unconstitutional criterion, that was also applied arbitrarily, so that Plaintiffs, and the other losing applicants, stand to suffer both economic and non-economic losses should the license process under the Hope Act continue in its current state.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to a preliminary injunction enjoining the use of the unconstitutional and arbitrarily applied residency criterion in the Hope Act licensing process, and that the scoring process be corrected so that residency does not affect the awarding of licenses under the Hope Act

Respectfully submitted this 26th day of October 2021.

TAYLOR LEE & ASSOCIATES LLC

/s Jerome Lee
Jerome D. Lee
Georgia Bar #: 443455

6855 Jimmy Carter Boulevard
Building 2100, Suite 2150
Norcross, Georgia 30071
Telephone: (770) 650-7200
Facsimile: (678) 735-4512
Email:  jerome@htlweb.com
Attorneys for the Plaintiffs

EXHIBIT A

# GEORGIA
# CORPORATIONS DIVISION



GEORGIA SECRETARY OF STATE
# BRAD RAFFENSPERGER

HOME (/)

## BUSINESS SEARCH

### BUSINESS INFORMATION

Business Name: **TREEVANA REMEDY INC**

Business Type: **Domestic Profit Corporation**

NAICS Code: **Agriculture, Forestry, Fishing and Hunting**

Principal Office Address: **2493 Vinson Hwy, Milledgeville, GA, 31061, USA**

State of Formation: **Georgia**

Control Number: **20240899**

Business Status: **Active/Compliance**

NAICS Sub Code: **All Other Miscellaneous Crop Farming**

Date of Formation / Registration Date: **12/7/2020**

Last Annual Registration Year: **2021**

### REGISTERED AGENT INFORMATION

Registered Agent Name: **REGISTERED AGENTS INC.**

Physical Address: **300 Colonial Center Pkwy, Ste100N, Roswell, GA, 30076, USA**

County: **Fulton**

### OFFICER INFORMATION

| Name | Title | Business Address |
| --- | --- | --- |
| Anthony Luyai | CEO | 6362 Mountain Ridge Circle, Sugar Hill, GA, 30518, USA |
| Ibifuro Peters | CFO | 2493 Vinson Hwy, Milledgeville, GA, 31061, USA |
| Mark Schwaiger, Jr. | Secretary | 2493 Vinson Hwy, Milledgeville, GA, 31061, USA |

Back          Filing History          Name History          Return to Business Search



# GEORGIA
# CORPORATIONS DIVISION

GEORGIA SECRETARY OF STATE
# BRAD RAFFENSPERGER

HOME (/)

## BUSINESS SEARCH

### BUSINESS INFORMATION

#### BUSINESS INFORMATION

| | | | |
|---|---|---|---|
| Business Name: | **TheraTrue Georgia, LLC** | Control Number: | **20192618** |
| Business Type: | **Domestic Limited Liability Company** | Business Status: | **Active/Compliance** |
| NAICS Code: | **Any legal purpose** | NAICS Sub Code: | |
| Principal Office Address: | **4062 Peachtree Road, Suite A300, Atlanta, GA, 30319, USA** | Date of Formation / Registration Date: | **10/7/2020** |
| State of Formation: | **Georgia** | Last Annual Registration Year: | **2021** |

### REGISTERED AGENT INFORMATION

Registered Agent Name: **Wade H. Stribling**

Physical Address: **999 Peachtree Street, Suite 2300, Atlanta, GA, 30309, USA**

County: **Fulton**

Back          Filing History          Name History          Return to Business Search

© 2015 PCC Technology Group, All Rights Reserved. Version 6.2.17

Report a Problem?

Control Number : K309676

# STATE OF GEORGIA

## Secretary of State

Corporations Division
313 West Tower
2 Martin Luther King, Jr. Dr.
Atlanta, Georgia 30334-1530

## CERTIFICATE OF MERGER

I, **Brad Raffensperger**, the Secretary of State and the Corporation Commissioner of the State of Georgia, do hereby issue this certificate pursuant to Title 14 of the Official Code of Georgia Annotated certifying that articles or a certificate of merger and fees have been filed regarding the merger of the below entities, effective as of **12/28/2020**. Attached is a true and correct copy of the said filing.

**Surviving Entity:**
DESIGN SELLUTIONS, INC., a Domestic Profit Corporation

**Changing its Name to:**
Trulieve GA, Inc., a Domestic Profit Corporation

**Nonsurviving Entity/Entities:**
Trulieve GA, Inc., a Domestic Profit Corporation

WITNESS my hand and official seal in the City of Atlanta
and the State of Georgia on **12/28/2020**.



Brad Raffensperger
Secretary of State

**STATE OF GEORGIA**
**ARTICLES OF MERGER**
**OF**
**TRULIEVE GA, INC., A GEORGIA CORPORATION**
**WITH AND INTO**
**DESIGN SELLUTIONS, INC., A GEORGIA CORPORATION**

December 23, 2020

Pursuant to the provisions of the Georgia Code, including, without limitation, Section 14-2-1101 thereof, DESIGN SELLUTIONS, INC., a Georgia corporation ("Surviving Company"), hereby certifies the following in connection with the merger of TRULIEVE GA, INC., a Georgia corporation ("Merging Company"), with and into the Surviving Company ("Merger"):

1. The name and state of formation of each corporation that is merging (each a "Constituent Company") are:

| NAME | STATE OF FORMATION |
|---|---|
| DESIGN SELLUTIONS, INC. | Georgia |
| TRULIEVE GA, INC. | Georgia |

2. The name of the surviving company is TRULIEVE GA, INC.

3. As of the effective date of the Merger, the charter of the Surviving Company, as in effect immediately prior to the effective date of the Merger, shall remain the charter of the Surviving Company.

4. The executed Agreement and Plan of Merger, dated as of December 23, 2020 ("Plan of Merger"), setting forth the terms and conditions of the Merger is on file at the principal place of business of the Surviving Company at 1910 Silver Leaf Way, Alpharetta, GA, 30005.

5. A copy of the Plan of Merger will be furnished by the Surviving Company, on request and without cost, to any shareholder of any Constituent Company that is a party to the merger or whose shares are involved in the share exchange.

6. The Merger has been duly authorized and approved by each Constituent Company in accordance with Section 14-2-1101 of the Georgia Code and by its organizational documents.

7. The Merger was duly approved by the sole Shareholder of the Merging Company and by the sole Shareholder of the Surviving Company.

8. The Surviving Company shall request publication of a notice of filing these Articles of Merger in accordance with and as required by Section 14-2-1105.1.

9. The Merger shall become effective upon the filing of these Articles of Merger with the Georgia Secretary of State.

55830234:4



# GEORGIA
# CORPORATIONS DIVISION

## BUSINESS SEARCH

### BUSINESS INFORMATION

Business Name: **Natures GA, LLC**

Business Type: **Domestic Limited Liability Company**

NAICS Code: **Health Care and Social Assistance**

Principal Office Address: **345 Thoroughbred Ln, Macon, GA, 31216, USA**

State of Formation: **Georgia**

Control Number: **20238343**

Business Status: **Active/Compliance**

NAICS Sub Code: **Offices of All Other Miscellaneous Health Practitioners**

Date of Formation / Registration Date: **12/3/2020**

Last Annual Registration Year: **2021**

### REGISTERED AGENT INFORMATION

Registered Agent Name: **Corporation Service Company**

Physical Address: **2 Sun Court, Suite 400, Peachtree Corners, GA, 30092, USA**

County: **Gwinnett**

Back            Filing History            Name History            Return to Business Search

EXHIBIT B

STATE OF GEORGIA
GEORGIA ACCESS TO MEDICAL CANNABIS COMMISSION

In the Matter of

WINDFLOWER GEORGIA, LLC

    Protestor,

v.

GEORGIA ACCESS TO MEDICAL
CANNABIS COMMISSION,

    Agencies.

PROTEST

Class-1 Low THC Oil Production License

## WINDFLOWER GA, LLC'S POST-AWARD PROTEST

COMES NOW, Windflower Georgia, LLC (hereinafter "Windflower"), pursuant to O.C.G.A. § 16-12-221(a) and the Georgia Access to Medical Cannabis Commission (hereinafter "Commission") Post-Award Protest Procedures, and submits this, it's Post-Award Protest against the Commission's (hereinafter "the Commission") Notice of Intent to Award Class 1 Production License to Botanical Sciences, LLC and Trulieve GA, Inc. (hereinafter "Protest").

### INTRODUCTION

On November 23, 2020, the Commission announced Competitive Application Requests for Proposals For Class 1 and Class 2 Production Licenses. Windflower submitted its application in response to this request on January 27, 2021, before 2:00 p.m. Windflower's application submission was timely and fully complied with all regulatory guidelines. On July 24, 2021, the Commission issued its Notice of Intent to Award Class 1 Production Licenses to Botanical Sciences, LLC and Trulieve GA, Inc. According to Section 2.0 of the Cannabis Commission Post-

instruction on what criteria must be considered when evaluating industry experience, stating, "The commission shall consider the relevant industry experience and strength of the applicant's management team and board of directors when considering its merits." The Commission abandoned these objective standards when grading Windflower's application.

The Commission relies on this Code Section in Schedule D1 of the evaluation sheet, but unjustifiably expands the scope to include considerations of whether applicants demonstrate "significant involvement in the business by one or more minority business enterprises as defined in O.C.G.A. § 50–5–131, as co-owners of the business," as well as "diversity in management positions and board representation as applicable." By doing so, the Commission exceeded the legal authority granted to it in Ga. Code Ann. § 16–12–211(b)(10) in evaluating industry and management experience and included grading considerations derived from Ga. Code Ann. § 16-12-211(b)(9) relating to minority involvement that should not have been applied in this portion of the application. In its application, Windflower demonstrated overwhelming management and medical cannabis experience through its board of directors and management team, clearly meeting all objective standards set forth by the statute. To apply considerations of minority co-ownership and diversity in management positions and board representation when evaluating applicants' industry and management experience exceeds the authority explicitly granted to the Commission by law and utilizes improper discretion. Windflower's application should be re-graded to credit the application the full allotment of points for Schedule D1.

Schedule D2 – Residency & Tax Filing Requirement: Ga. Code Ann. § 16–12–211(b) states an applicant, "must be a Georgia corporation or entity and shall maintain a bank account with a bank or credit union located in this state." Schedule D2 of the evaluation sheet relies on this Code Section and states, "evidence must be provided to validate this by submitting: (a) Georgia

Corporation or LLC Certificate of Existence with Control Number (b) Articles of Incorporation or Organization with original filing date (c) A Georgia tax identification number." Windflower Georgia provided in its submission its articles of organization, Georgia LLC Certificate of Existence with Control Number, and its state and federal tax identification numbers. Thus, Windflower should be awarded *all available points* in Schedule D2.

### 2.    Schedule E

Schedule E1: In Schedule E1 of the Class 1 Production evaluation sheet, Windflower should be awarded *all available points* for locating in a tier one county. Ga. Code Ann. § 16–12–211(b)(13) governs that a Class 1 applicant shall state on their application, "a description of any efforts made by the applicant to create jobs or locate facilities in tier one or tier two counties as defined in Code Section § 48–7–40." Windflower demonstrated precisely what the law calls for, providing plans to locate its facility and create jobs in Athens-Clarke County, a tier one county as defined in Ga. Code Ann. § 48–7–40. The Commission failed to credit Windflower with all available points in this schedule, noting that although Athens-Clarke County qualified as a tier 1 county under law, it is surrounded by tier 3 and tier 4 counties. This reasoning clearly demonstrates improper discretion on behalf of the Commission in denying the totality of points that should have been awarded based on objective standards clearly specified in the law. This use of discretion is a violation of both the Hope Act and due process, and Windflower should be awarded *all available points* in Schedule E1 for meeting the objective standards of the statute.

Schedule E2: The Commission erred in grading Windflower's application in Schedule E2 of the Class 1 Production application evaluation sheet. Schedule E2 states that applicants should,

"(a) Describe the applicant's Diversity Plan that promotes and ensures the involvement of diverse participants and diverse groups in management, hiring, employment, and contracting opportunities. Diverse participants include individuals from diverse racial, ethnic

STATE OF GEORGIA

DEPARTMENT OF ADMINISTRATIVE SERVICES

In the Matter of
ACC, LLC

         Protestor,

v.

GEORGIA ACCESS TO MEDICAL
CANNABIS COMMISSION
DEPARTMENT OF ADMINISTRATIVE
SERVICES, AND EXECUTIVE
DIRECTOR OF THE CANNABIS
COMMISSION

         Agencies.

:
:
:
:
:
:
:
:
:
:
:
:
:

SOLICITATION

Class-1 Low-THC Oil Production
License

**POST-AWARD BID PROTEST OF NOTICE OF INTENT TO AWARD A CONTRACT
FOR THE CLASS 1 LOW-THC OIL PRODUCTION LICENSE**

      Pursuant to the Georgia Access to Medical Cannabis Commission ("Commission")

Administrative Protest Procedures, ACC, LLC ("ACC") files this Post-Award Bid Protest of the

Notice of Intent to Award a Contract for the Class 1 Low-THC Oil Production License issued by

the Commission. As explained below, the evaluators have overlooked certain documents that were

originally included within ACC's application, and points were deducted for documents not actually

required by the application instructions, resulting in a much lower score for ACC than what was

earned. It appears that deficiencies in the applications of the top-scoring applicants may also have

been overlooked, but ACC has not obtained access to the detailed evaluations of those scores as

of this date.  Therefore, ACC reserves the right to bring any other legal claims that may arise during

the course of this protest procedure, including addressing claims pertaining to the applications of

1

**Schedule D2's Residency and Tax Filing Requirement (O.C.G.A. § 16-12-211 (b))**

Application Requirements: The Applicant must be incorporated or organized as a Georgia corporation or entity under the laws of the State of Georgia. Evidence must be provided to validate this by submitting:

a. Georgia Corporation or LLC Certificate of Existence with Control Number

b. Articles of Incorporation or Organization with original filing date (c)

c. A Georgia tax identification number.

Score: 33.75/45 points.

Evaluator notes: "*appears to meet standards.*"

Response: ACC's Articles of Organization can be found on Page 7 of Schedule D (Page 108 overall). The Certificate of Organization to prove ACC is a registered Georgia LLC can be found starting on Page 6 of Schedule D (Page 107 overall), with the listed Control Number of 20240258. ACC's Tax Identification Number can be found starting on Addendum 4 (Page 109 overall). All documents necessary for completing this schedule are completed, but only 33.75 out of 45 points were awarded for this section. The reviewer noted no reason for deducting points despite all required documentation being present. ACC has fully met and exceeded the requirements and should be awarded an additional 11.25 points for a total of 45 points.

**Schedule E1's Tier 1 and Tier 2 Job Creation (O.C.G.A. § 16-12-211 (b)(13))**

Application Requirements: Provide a description of any efforts made by the applicant to create jobs or locate facilities in tier one or tier two counties. Tier System explained (O.C.G.A. § 48-7-40)

Score: 12.5/50 points.

EXHIBIT C


casetext

Docket No. 2:20-cv-00208-NT
UNITED STATES DISTRICT COURT DISTRICT OF MAINE

# NPG, LLC v. City of Portland

Decided Aug 14, 2020

Docket No. 2:20-cv-00208-NT

08-14-2020

NPG, LLC d/b/a WELLNESS CONNECTION and HIGH STREET CAPITAL PARTNERS, LLC, Plaintiffs, v. CITY OF PORTLAND, MAINE, Defendant.

Nancy Torresen United States District Judge

## ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANT'S MOTION TO DISMISS

Plaintiff Wellness Connection ("**Wellness**"), which is owned by Plaintiff High Street Capital Partners, LLC (collectively "**Plaintiffs**"), intends to operate an adult use retail marijuana store in Portland, Maine. In order to do so, Wellness must obtain a license from the City of Portland ("**the City**"), Pursuant to a local ordinance, the City will issue a maximum of twenty licenses, and those licenses will be awarded based on a point system. The Plaintiffs contend that the City's process for awarding licenses is unconstitutional, and they ask me to enjoin certain components of that process. Before me is the Plaintiffs' Motion for Preliminary Injunction (ECF No. 4) and the City's Motion to Dismiss under *Federal Rules of Civil Procedure* 12(b)(1) and 12(b)(6) (ECF No. 7). For the reasons set forth below, I **GRANT** the Plaintiffs' motion and **DENY** the City's motion. [2]

## BACKGROUND

### I. Marijuana Legalization in Maine

Marijuana is a controlled substance, prohibited by federal law. 21 U.S.C. § 841(a)(1) (the "**Controlled Substances Act**"); 21 C.F.R. § 1308.11(d)(23) (listing marijuana among the Schedule I "[h]allucinogenic substances"). Despite this federal classification, medical marijuana has been legal in Maine for more than twenty years, and medical marijuana dispensaries have been allowed to operate for more than ten years. Def.'s Mot. 3 (citing 22 M.R.S. § 2428). In 2016, Maine voters approved a referendum to legalize the recreational use of marijuana, and in 2018 the Maine Legislature enacted the "Marijuana Legalization Act" to facilitate the development and administration of a regulated marketplace for adult use marijuana. *See* L.D. 1719 (128th Leg. Me. 2018); 28-B M.R.S. § 101. The State's Office of Marijuana Policy ("**OMP**") subsequently passed rules to implement the statute, including rules for the issuance of State marijuana retail licenses.[1] *See* 18-691 C.M.R. (2019); 28-B M.R.S §§ 103-04.

[1] Individual applicants and corporate officers for a corporation seeking a state adult use license must meet the following requirements: he at least 21 years of age; be incorporated in the state; not have a disqualifying drug offense; not be an employee of a state agency; not be a law enforcement or corrections officer; not have had a state marijuana license previously revoked; not have a registry identification card issued under the state medical marijuana statute revoked; not have had any other marijuana license or government-issued authorization revoked; not have outstanding court-ordered

payments, submit to a criminal history record check, and comply truthfully with the application process. 28-B M.R.S. § 202. OMP also considers whether an applicant has been convicted of any offense involving fraud or dishonesty, its tax compliance, and other state marijuana-related violations. 28-B M.R.S. § 203.

Under the Marijuana Legalization Act, a municipality can choose to permit adult use marijuana establishments within its jurisdiction by passing a local [3] ordinance.[2] 28-B M.R.S § 402(1). In municipalities that have decided to permit retail marijuana sales, applicants must follow several steps in order to begin conducting such sales. First, an applicant must obtain a conditional state license from OMP.[3] 28-B M.R.S § 402(1). Next, the applicant must apply for an adult use license from the municipality. 28-B M.R.S. § 402(3); 28-B M.R.S. § 205. If the applicant succeeds in obtaining local authorization, it must then return to OMP for an active license and final approval. 28-B M.R.S § 205(4). To receive an active license, a retailer must continue to meet the requirements for the conditional state license, pay the state license fee, and submit a plan detailing the location, size, and layout of the marijuana establishment. 28-B M.R.S § 205(4).

[2] Municipalities also have the authority to authorize certain types of marijuana businesses, including retail, cultivation, manufacturing, and testing; to put restrictions on the operation of adult use facilities; and to prohibit all recreational use businesses. 28-B M.R.S § 401; Def's Mot. 3 (ECF No. 7).

[3] To date, 23 applicants have obtained conditional licenses from the State to operate recreational marijuana retail stores in Portland, and several other applicants have obtained conditional licenses but have not yet specified a municipality. See OMP, Adult Use Applications in Conditional Status, available at

https://www.maine.gov/dafs/omp/open-data/adult-use (last visited August 14, 2020).

The Marijuana Legalization Act requires that an applicant for a state license be a resident or—in the case of a corporation—that every corporate officer be a resident and a majority of the shares of the corporation be held by Maine residents or Maine business entities. 28-B M.R.S § 202(2). The State subsequently decided not to enforce this residency requirement, because the Attorney General believed that the requirement was "subject to significant constitutional challenges and [was] not [4] likely to withstand such challenges." See Stipulation of Dismissal (ECF No. 9), NPG LLC v. Me. Dept. of Admin. and Fin. Servs. No. 1:20-cv-00107-NT.

## II. Portland's Adult Use Marijuana Licensing Scheme

In May of 2020, the Portland City Council enacted Chapter 35 of the City of Portland Code of Ordinances, which permits 20 adult use retail stores in the city. See City Code § 35-43(f). To allocate those adult use licenses, the City grades applications using the following points matrix:

| Criteria | Points |
| --- | --- |
| At least 51% owned by socially and economically disadvantaged individual(s), as defined further by regulations to be promulgated by the City Manager based off[6] of the Small Business Association Section 8(a) regulations. | |
| At least 51% owned by individual(s) who have been a Maine resident for at least five years. | 5 |
| Owned by individual(s) with experience running a business in a highly regulated industry, such as marijuana, liquor,[6] banking, etc. with no history of violations or license suspensions or revocations. | |


casetext

Owned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years.

Owned by individual(s) who have been a registered caregiver in the State of Maine3 for at least two years.

Ownership of proposed retail location by applicant; or at least five year lease for4 proposed retail location.

Evidence of at least $150,000 in liquid 2 assets

Business plan committing to social and economic development, by including three or more of the following: 1. Create at least 4 five (5) full-time jobs paying a minimum of $15/hr; 2. Provide PTO (or vacation/sick time) and health benefits to employees;

3. Provide at least one annual training around diversity, cultural awareness, sexual harassment, or workplace violence. Training must be in addition to any required by the State or City; 4. Annual contribution of 1% net profits as a restricted donation to the City for youth education on substance use education and prevention.

City Code § 35-14(f)(3)-(4) (ECF No. 4-1). The twenty applicants with the highest scores are awarded municipal licenses. However, an applicant will not receive a municipal license if it is located within 250 feet of another applicant with more points. City Code § 35-14. The application period for the first round of licensing began on July 1, 2020, and will close on August 31, 2020. Def's Mot. 4.

As the rubric shows, five of the available 34 points are awarded if the applicant is "[a]t least 51% owned by individual(s) who have been a Maine resident for at least five years." City Code §

35-14(f)(3). A further four points are granted if the applicant is "[o]wned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years." City Code § 35-14(f)(3). In deciding to retain these factors even after the State abandoned its residency requirement, City Councilmembers suggested that the City intended to "advantage or give a slight preference for individuals and entities that have been Maine residents," and to "allow[] the local market to grow before there was an opportunity for outside investment to come in." Portland City Council Meeting (May 18, 2020) at 3:42:55-3:43:30; 3:45:15-3:47:20, available at https://reflect-pmc-me.cablecast.tv/CablecastPublicSite/show//15380?channel=1 (last visited August 14, 2020) ("**City Council Meeting**").

## III. The Plaintiffs

Wellness operates the sole medical marijuana dispensary in Portland. Comments of Wellness Connection of Maine. Comments of Wellness regarding Marijuana Business Licenses Ordinance 1 ("**Wellness Comments**") (ECF No. 7-3). Wellness is 100% owned by High Street Capital, a Delaware corporation that is at least 95% owned by non-Maine residents and companies. Decl. of Ron A. MacDonald ¶¶ 3-4 ("**MacDonald Decl.**") (ECF No. 4-2); Decl. of Kevin Murphy (ECF No. 4-3).

Wellness has applied to OMP for multiple adult use retail licenses throughout the state. MacDonald Decl. ¶ 5. The company has received a conditional state license from OMP to apply for an adult use retail license in Portland. NPG Conditional License (ECF No. 9-1). Wellness intends to apply for that retail license in Portland before the application window closes on August 31, 2020. See MacDonald Decl. ¶ 6; Def's Mot. 4.

## IV. Procedural History

On June 15, 2020, the Plaintiffs filed a Complaint seeking declaratory and injunctive relief (ECF No. 1) and a motion for a preliminary injunction. Pls.' Mot. (ECF No. 4). I reserved ruling on the motion until the Plaintiffs served the Defendant and the Defendant had the opportunity to respond. Order (ECF No. 5). The City filed a combined opposition to the motion for preliminary injunction and a motion to dismiss. Def.'s Mot. (ECF No. 7). The Plaintiffs filed a combined reply to their motion ⁷ and opposition to the City's motion. Pls.' Reply (ECF No. 9). Finally, the City filed a reply in support of its motion to dismiss. Def.'s Reply (ECF No. 12).

## DISCUSSION

### I. The City's Motion to Dismiss

The City asserts that this case should be dismissed under Federal Rule of Civil Procedure Rule 12(b)(1) because the Plaintiffs lack standing and because the Plaintiffs' claims are not ripe. Def.'s Mot. 2. Since those arguments raise jurisdictional concerns, I address them first. *See Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims. . . ."); *see also Shell Offshore Inc. v. Greenpeace*, 864 F. Supp. 2d 839, 842 (D. Alaska 2012) ("A district court may not grant a preliminary injunction if it lacks subject matter jurisdiction over the claim before it."). The City's third basis for dismissal—failure to state a claim pursuant to Rule 12(b)(6)—is discussed in conjunction with the Plaintiffs' preliminary injunction motion.

### A. Legal Standard

A motion to dismiss under Rule 12(b)(1) challenges a court's subject-matter jurisdiction.[4] The Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, and "[t]hat limitation . . . is fundamental ⁸ to the federal judiciary's role within our constitutional separation of powers."

*Reddy v. Foster*, 845 F.3d 493, 499 (1st Cir. 2017) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)); *see also Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 221 (1st Cir. 2019) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.") (alteration in original and quotations omitted). District courts have an obligation to ensure that they have jurisdiction over a case before proceeding to the merits. *Olsen v. Hamilton*, 330 F. Supp. 3d 545, 551 (D. Me. 2018) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88-89 (1998)).

---

[4] Unlike a motion under 12(b)(6), a court considering a motion under 12(b)(1) may consider materials outside the pleadings. *Gordon v. N&D Transp. Co.*, 866 F.3d 22, 24 n.3 (1st Cir. 2017) (citing *González v. United States*, 284 F.3d 281, 288 (1st Cir. 2002)); *Carroll v. United States*, 661 F.3d 87, 94 (1st Cir. 2011).

---

Both standing and ripeness are "interrelated" components of this constitutional requirement. *Reddy*, 845 F.3d at 499-500. The doctrine of standing serves to "identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To show that she has Article III standing, a plaintiff must establish " '(1) an injury in fact which is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) that the injury is fairly traceable to the challenged action, and (3) that it is likely . . . that the injury will be redressed by a favorable decision.' " *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quoting *U.S. Dep't of Health & Human Servs.*, 923 F.3d at 221-22). An injury is "concrete" if it is real and not abstract, *id.* (quoting *Spokeo*, 136 S. Ct. at 1548), and '" it is "particularized" if it ' 'affects the plaintiff in a


casetext

personal and individual way.' *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560).

"Whereas standing asks 'who' may bring a claim, ripeness concerns 'when' a claim may be brought." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007). The ripeness doctrine "seeks to prevent the adjudication of claims relating to 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Reddy*, 845 F.3d at 500 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (explaining that the purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements") (internal quotations omitted). In assessing whether a claim is ripe, I evaluate "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Generally, both prongs must be satisfied for a claim to be ripe. *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013).

The fitness prong "has both jurisdictional and prudential components." *Id.* The jurisdictional component "concerns whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Id.* The key question of this component is " 'whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all' thus rendering any opinion [I] might offer advisory." *Algonquin Gas Transmission, LLC v. Weymouth, Mass.*, 919 F.3d 54, 62 (1st Cir. 2019) (quoting *10 *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995)). The prudential component "asks whether resolution of the case turns on legal issues not likely to be significantly affected by further factual development." *Id.* (internal quotations omitted). The underlying idea

is that, "if elements of the case are uncertain, delay may see the dissipation of the legal dispute without need for decision." *Roman Catholic Bishop*, 724 F.3d at 89 (internal quotations omitted); *see also Ernst & Young*, 45 F.3d at 535 ("This [fitness] branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed").

The hardship prong of the ripeness inquiry is "entirely prudential" and "evaluates the extent to which withholding judgment will impose hardship." *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 70 (1st Cir. 2003) (internal quotations omitted). In answering this question, a court considers "whether the challenged action creates a direct and immediate dilemma for the parties." *Algonquin Gas Transmission*, 919 F.3d at 62 (internal quotations omitted), and "whether granting relief would serve a useful purpose." *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011) (internal quotations omitted).

*11 In many cases, such as this one, Article III standing and ripeness issues "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014) (internal quotations omitted); *see also Foisie v. Worcester Polytechnic Inst.*, --- F.3d ----, 2020 WL 4249670, at *3 (1st Cir. July 24, 2020) ("The constitutional and prudential ripeness inquiries are interrelated and often duplicative."). "Much as standing doctrine seeks to keep federal courts out of disputes involving conjectural or hypothetical injuries, the Supreme Court has reinforced that ripeness doctrine seeks to prevent the adjudication of claims relating to 'contingent future events' " (quoting *Texas*, 523 U.S. at 300).

Establishing subject-matter jurisdiction is the plaintiff's burden, *id.* at 500-01, but I treat all well-pleaded facts as true and draw all reasonable

inferences in the plaintiff's favor. *Portland Pipe Line Corp. v. City of S. Portland*, 164 F. Supp. 3d 157, 174 (D. Me. 2016); *see also Lyman v. Baker*, 954 F.3d 351, 359–60 (1st Cir. 2020) (noting that same basic principles apply for analyses under both Rules 12(b)(1) and 12(b)(6)). A plaintiff can survive a 12(b)(1) motion to dismiss if she "plausibly plead[s] facts necessary to demonstrate standing to bring the action," though "[c]onclusory assertions or unfounded speculation will not suffice." *Dantzler*, 958 F.3d at 47.

## B. Analysis of the City's Motion

The City asserts that the Plaintiffs lack standing to challenge the licensing scheme because the Plaintiffs have failed to satisfy the first element of standing—identification of an actionable injury. Specifically, the City asserts that "no harm to Wellness has occurred or is even sufficiently imminent." Def.'s Mot. 12. The City explains that "there are numerous other events that would need to happen in order for Wellness to be denied a license," including that at least twenty other applicants apply for licenses, that those applicants obtain conditional state licenses, that those applicants qualify for more points than Wellness under the matrix, that those applicants are located more than 250 feet from another applicant with [12] more points, *12 and that those applicants open stores within one year.[5] Defs.' Mot. 12. The City emphasizes that Wellness has "not been denied an adult use marijuana retail license" and has "not even applied for such a license." Def.'s Mot. 11-12. Given these facts, the City argues that the Plaintiffs have "not put forth any evidence of actual harm, nor have they asserted any facts that would demonstrate more than mere 'potential' of harm." Def.'s Mot. 12.

[5] The City also stated that Wellness had not yet obtained a conditional license from the State, but it appears that Wellness has since satisfied this requirement. *See* NPG Conditional License (ECF No. 9-1).

According to the City, these contingencies also render the Plaintiffs' claims unripe and unfit for judicial review. Def.'s Mot. 13 (stating that Plaintiffs' "claim depends on a series of uncertain events that may or may not occur in the future"). The City adds that, because "residency is not an absolute bar but instead is one of many factors," it is not futile for Wellness to apply for a license. Def.'s Mot. 14. In terms of the hardship prong, the City states that "there is no impediment to Wellness moving forward without a decision from this Court," noting that Wellness "will apply for its adult use marijuana license . . . regardless of the outcome of this case." Def.'s Mot. 14-15.

In response, the Plaintiffs argue that the City misrepresents the asserted injury. Specifically, the Plaintiffs assert that the points matrix creates an "injury-in-fact" by "denying Plaintiffs the opportunity to participate in Portland's licensing process on equal footing with other applicants, free of the unconstitutional disadvantage the points matrix creates by basing over 25% of the [13] available points on *13 residency." Pls.' Reply 14. Because the injury is an inability to compete on equal footing, the Plaintiffs continue, the "Court need not entertain the 'contingencies' " raised by the City. Pls.' Reply 14. Nevertheless, the Plaintiffs add that it is "implausible or entirely hypothetical" to suggest that the points matrix will not be used to award licenses, noting that the State has already issued conditional licenses to more than twenty applicants with planned locations in Portland. Pls.' Reply 15. Even if other events occurred to reduce the number of valid applications so that the points matrix was not used, the Plaintiffs contend that they currently face "the 'substantial risk' . . . that the City will use the unconstitutional points matrix to award licenses." Pls.' Reply 15 (citing *Portland Pipe Line*, 164 F. Supp.3d at 179-80).

The Plaintiffs also argue that both prongs of the ripeness inquiry weigh in their favor. Their case is fit for review, they assert, because their inability to compete on equal footing exists "now and is not

6

casetext

dependent on future contingencies or a change in circumstances." Pls.' Reply 18. Moreover, the Plaintiffs emphasize that their claims are "entirely legal in nature" and "not 'bound up in the facts.'" Pls.' Reply 18. Finally, the Plaintiffs maintain that they and the City "are squarely adverse now," particularly because Wellness has obtained a conditional license from the State, and they contend that a decision in their favor would "level[ ] the playing field and eliminat[e] the unconstitutional factors in the City's points matrix before the matrix is used to award licenses." Pls.' Reply 18. The Plaintiffs highlight this last point in arguing that withholding judgment will impose hardship on them, noting that "the City intends to issue licenses this summer, and once the licenses are issued, the harm *14 cannot easily be redressed." Pls.' Reply 19 (explaining that the remedy at that point would require rescinding licenses or ordering the City to issue more than 20 licenses, "thereby undoing the licensing scheme" that the City created to prevent over-saturation of the market).

I conclude that the Plaintiffs have alleged a concrete injury. Although the Plaintiffs have not been denied a license, their alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's points matrix. This injury is not conjectural or speculative because, viewing the facts in the Plaintiffs' favor, there is every indication that there will be more than twenty applicants and that the City will apply the points matrix. *See* OMP Adult Use Applications in Conditional Status, available at https://www.maine.gov/dafs/omp/open-data/adult-use (last visited August 14, 2020) (identifying 23 entities that have obtained conditional licenses to operate in Portland). There is thus a "sufficient threat" that the Plaintiffs will be forced to compete at a disadvantage. *Dantzler*, 958 F.3d at 47 (citing *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)). Moreover, the Plaintiffs' asserted injury is "impending" and there is "some immediacy" associated with it, as the Plaintiffs have obtained

their state conditional license and the next hurdle in their quest is approval from the City. *McInnis-Misenor*, 319 F.3d at 68. And, finally, the Plaintiffs are the proper party to bring these claims because they are a nonresident entity that intends to apply for an adult use retail license from the City. They thus have "a personal stake *15 in the outcome of the controversy." *Gill*, 138 S. Ct. at 1929 (internal quotations omitted).

I also conclude that the Plaintiffs' claims are ripe. The claims are fit for review in part because they are legal in nature. Although whether the Plaintiffs will succeed in obtaining a license under the current scheme is uncertain and would be cleared up through further factual development, the question of whether the licensing scheme itself is unconstitutionally discriminatory does not depend on future events.[6] The case thus turns "on legal issues 'not likely to be significantly affected by further factual development.'" *McInnis-Misenor*, 319 F.3d at 70 (quoting *Ernst & Young*, 45 F.3d at 536).

[6] Given the express preference for entities with 51% ownership by Maine residents, this is not a case where the challenged statute is facially neutral and nondiscriminatory and thus the plaintiff would need to show discriminatory effect or purpose through other facts.

In terms of whether withholding judgment would impose hardship on the Plaintiffs, it is true that Wellness might still obtain a license and thus, ultimately, might suffer no lingering hardship. But I note that the hardship prong is a prudential limitation, not a constitutional one. *Algonquin Gas Transmission*, 919 F.3d at 62. There are two apparent problems with waiting to see if Wellness secures enough points to proceed to final approval. First, Wellness might obtain enough points based on the current matrix to land within the top twenty applicants, but—because of the residency-related criteria—it could still have fewer points than an applicant within 250 feet, thus dooming its application. Second, if Wellness is denied a

license—whether through the example above or because it falls outside the top twenty [16] applicants—a subsequent ruling that the licensing scheme is unconstitutional could throw a wrench into the process, particularly in light of the 250-foot buffer rule.[7] These considerations suggest that a ruling now on the constitutionality of the points matrix would "serve a useful purpose." *Verizon New England, Inc.*, 651 F.3d at 188 (quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir. 1994)).

[16] The 250-foot buffer rule shows why the initial ranking of applicants matters. Applicants with more points have preference over other applicants within 250 feet. If the awarding of points is found to be unconstitutional, that ranking could change and thus the corresponding qualification and disqualification of applicants could change.

Considering the facts in the light most favorable to the Plaintiffs, I conclude that the Plaintiffs have demonstrated a "direct and immediate dilemma" sufficient for ripeness purposes. *Ernst & Young*, 45 F.3d at 535 (quoting *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992)); *see also Portland Pipe Line Corp.*, 164 F. Supp. 3d at 179.

## II. Preliminary Injunction [8]

[8] The City moves to dismiss the case for failure to state a claim. Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Such a motion may be based on "(1) a challenge to the sufficiency of the pleading under Rule 8(a)(2); or (2) a challenge to the legal cognizability of the claim." *Fuoco v. Rogers*, No. 2:18-cv-00290-JAW, 2019 WL 1387686, at *2 (D. Me. Mar. 27, 2019) (internal quotations omitted). Because the crux of the City's argument is that the Plaintiff has not identified a cognizable claim, this issue overlaps with the Plaintiffs' likelihood of success, albeit with a different legal standard. Because I find that the Plaintiffs are likely to succeed on the merits, I also find that the Plaintiffs have stated a claim, and I deny the City's motion to dismiss.

The Plaintiffs seek a preliminary injunction enjoining the City from enforcing the two criteria of the points matrix that they say create an unconstitutional preference for Maine residents. The Plaintiffs contend that these criteria [17] discriminate against nonresident applicants in violation of the dormant Commerce Clause.

[17]

## A. Legal Standard

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Monga v. Nat'l Endowment for the Arts*, 323 F. Supp. 3d 75, 82 (D. Me. 2018) (quoting *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012)). In deciding whether to issue a preliminary injunction, I consider four factors:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e.. the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (internal quotations omitted). The moving party "bears the burden of establishing that these four factors weigh in its favor," *id.* at 18, but the likelihood of success on the merits is the most important. *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). If the movant "cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." *Id.*

## B. Analysis of Plaintiffs' Motion

## 1. Likelihood of Success on the Merits

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an [18] affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337-38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337-38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[9] *Id.* at 10-11; *see also Tenn. Wine & Spirits Retailers Ass'n v. [*10] Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack

of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

[9] Statutes that "regulate[] [evenhandedly and ha[ve] only incidental effects on interstate commerce engender[] ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). The City contends that that the licensing scheme must be analyzed "as a whole," adding that "other factors may tend to favor out-of-state entities." Def's Mot. 15-17. But the City does not appear to argue that the residency factors themselves are facially neutral. Nor does the City develop any argument about how the other factors can remedy the clear disadvantage faced by nonresidents. Of the 34 available points, nonresidents are facially precluded from at least five points and likely precluded from a total of nine. These factors thus endorse the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (internal quotations omitted). Merely suggesting that nonresident entities *might* benefit from the other factors cannot overcome that facially differential treatment and does not show that the licensing scheme "regulates evenhandedly." *See Wine & Spirits Retailers*, 481 F.3d at 11; *see also Walgreen Co. v. Rullan*, 405 F.3d 50, 58-59 (1st Cir. 2005) (rejecting argument that "a favored group must be entirely in-state for a law to have a discriminatory effect on commerce" and explaining that a statute can discriminate against commerce if "it favor[s] a class comprised *mostly* of [in-state] interests") (emphasis in original).

casetext

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to '[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.' " *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1983) (quoting *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 44 (1980)). The standard for finding such congressional consent is "high," and the state or local jurisdiction has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138-39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.' "); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430-32 (3d Cir. 2011).

The Plaintiffs argue that two components of the points matrix violate the dormant Commerce Clause—the five points for entities that are at least 51% owned by individuals who have been Maine residents for at least five years and the four points for entities that are owned by individuals who have been previously licensed for a non-marijuana-related business in Maine. Pls.' Mot. 5. Both provisions, they contend, "plainly favor[ ]" Mainers over non-residents." Pls.' Mot. 7 (quoting *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2462). Moreover, they argue that the City "cannot demonstrate a legitimate local purpose for the residency preference," noting that the City Council "was clear that the point of the residency

preference is to . . . 'advantage . . . individuals and entities that have been Maine residents, local businesses, smaller businesses.' " Pls.' Mot. 10 (quoting City Council Meeting at 3:42:52-3:43:30, 3:45:15-3:47:20).

As is clear from the text of the licensing scheme and the statements by councilmembers, the City sought to create a preference for resident-owned marijuana retail stores.[10] *See* City Council Meeting at 3:42:52-3:43:30, 3:45:15-3:47:20 [21] (discussing goal of "allowing the local market to grow before there was an opportunity for outside investment to come in"). Rather than disputing the discriminatory character of the residency preference factors, the City attempts to argue that the licensing of marijuana retail stores operates in a unique dimension, noting that "[m]arijuana has been, and remains, a Schedule I drug under the [Controlled Substances Act]."[11] Def.'s Mot. 8-9.

[10] The City is not in the clear simply because marijuana will not be traversing state lines. The dormant Commerce Clause "prohibits state discrimination against all out-of-state economic interests," not just discrimination "against products or producers." *Tenn. Wine & Spirits*, 139 S. Ct. at 2471 (internal quotations omitted, emphasis in original); *see also C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994) ("Discrimination against interstate commerce in favor of local business or investment" is subject to "rigorous scrutiny"). Moreover, the Supreme Court has already held that Congress's power can extend to the regulation of the intrastate manufacture and possession of marijuana. *See Gonzales v. Raich*, 545 U.S. 1, 22 (2005).

[11] The City argues that marijuana is "contraband" and thus sales of marijuana do not enjoy dormant Commerce Clause protections. Def.'s Mot. 8-10. In making that argument, the City cites a case where the product at issue was considered contraband under both state and federal


casetext

law. Def's Mot. 9-10 (citing *New York v. Grand River Enters. Six Nations, Ltd.*, No. 13-CV-6910AfB, 2020 U.S. Dist. LEXIS 44451 (W.D.N.Y Mar. 10, 2020) (untaxed cigarettes)). But, here, the City is actively and voluntarily creating a market for recreational marijuana retail sales. I am unpersuaded that the City can legalize and promote marijuana sales on the one hand, while simultaneously labeling marijuana as contraband in order to justify discrimination against nonresidents who seek to participate in the market.

As noted, Congress can "redefine the distribution of power over interstate commerce" by expressly authorizing otherwise invalid state legislation. *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88, 91-92 (1984) (internal quotations omitted) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). But it is unlikely that the City will be able to meet its burden of demonstrating unmistakably clear congressional intent [*22] to permit the sort of in-state preference found in the points matrix.[12] *See Am. Trucking Ass'ns, Inc. v. Alviti*, C.A. No. 18-378-WES, 2020 WL 4050237, at *2 (D.R.I. July 20, 2020).

The City portrays the Controlled Substances Act as a form of congressional consent.[15] Def's Mot. 10 (arguing that the Plaintiffs "cannot make out a case for protection under the dormant Commerce Clause" because "Congress has exercised its right to regulate marijuana under the Commerce Clause . . . and has chosen to prohibit it"). But the Act nowhere says that states may enact laws that give

preference to in-state economic interests.[14] In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co.*, 455 U.S. at 341 (quoting *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769 (1945)). And I have no authority to invent such an affirmative grant where Congress has not provided it.[15] *See id.* at 343 ("[W]hen [*23] Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause. . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind.") (internal quotations omitted).

---

12 Another problem with the City's position is that the Supreme Court recently reiterated that "the Commerce Clause [does] not permit the States to impose protectionist measures clothed as police-power regulations." *Tenn. Wine & Spirits*, 139 S. Ct. at 2468.

13 Given the State's position that its residency requirement is likely unconstitutional, it is unclear to me how the City can take the position that the dormant Commerce Clause is inapplicable in the recreational marijuana context.

14 Section 903 of the Controlled Substances Act discusses the "Application of State Law," but it simply states that nothing in the Act "shall be construed as indicating an intent on the part of the Congress to occupy the field . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State." 21 U.S.C. § 903.

15 As the Plaintiffs note, the "Rohrabacher-Farr Amendment, passed in 2014 and renewed by Congress each year since, prohibits the U.S. Department of Justice from using federal funds to interfere with the implementation of state medical marijuana laws." Pls.' Mot. 11; *see* Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). But that amendment speaks only to medical marijuana, not the recreational marijuana sales at issue here. Congress has simply not spoken on whether the states that have legalized recreational marijuana

are allowed to enact laws that would violate the dormant Commerce Clause. Specific affirmative authorization is required. *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 571 (1st Cir. 1996) ("Absent, at least, an affirmatively stated grant of permission to noncontiguous jurisdictions of the United States to require egg-labeling [that identifies the egg's state of origin], we are unable to conclude that appellants have met their burden of showing that Congress' intent to allow Puerto Rico to enact protectionist egg-labeling regulations was 'unmistakably clear.'").

Because I conclude the dormant Commerce Clause likely restricts the City's licensing of marijuana retail stores, the burden falls on the City to justify its licensing scheme. "State laws that discriminate against interstate commerce face 'a virtually *per se* rule of invalidity.'" *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018) (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005). Theoretically, the City could save the residency preference factors if it showed that those factors "advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338 (internal quotations omitted). But that purpose must be "distinct from the simple economic protectionism the [dormant Commerce Clause] abhors." *id.* at 341, and "justifications for discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.'" *Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 101 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979). The City would need to "present[ ] 'concrete record evidence,' and not 'sweeping assertions' or 'mere speculation,' to substantiate . . . claims that the discriminatory aspects of its challenged policy are necessary to achieve its asserted objectives." *Family Winemakers of Cal.*, 592 at 17 (quoting *Granholm*, 544 U.S. at 492-93).

The City offers little to substantiate its claims that the residency factors are necessary to achieve its asserted purposes. It contends that the reason for the local preferences "was to ensure that the City understood the amount and quality of oversight and could easily verify any past violations." Def.'s Mot. 17. Although this argument is undeveloped, and likely waived at this juncture, it is also unsupported.[16] *See Family Winemakers of Cal.*, 592 F.3d at 17. At this stage, given the express language in the points matrix and the statements by City officials suggesting a protectionist purpose, I conclude that the City is unlikely to succeed in justifying the residency preferences in its points matrix. *See Granholm*, 544 U.S. at 492-93 (explaining that the "burden is on the State to show that the *discrimination* is demonstrably justified" and noting that the "Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable") (internal quotations omitted).

<hr/>

[16] I also note that the State has an elaborate vetting process that would likely identify past violations. *See supra* note 1.

### 2. Remaining Factors

Although the likelihood of success on the merits is the most important of the four factors used in evaluating a motion for a preliminary injunction, I will briefly discuss on the remaining factors.[25]

First, I consider the potential irreparable harm to the Plaintiffs if I decline to issue a preliminary injunction. The Plaintiffs argue that, if their motion is not granted, they will be harmed because Wellness will face a "significant disadvantage" in obtaining a retail license. Pls.' Mot. 14. Even if they eventually prevail on the merits, the Plaintiffs note that the City may have already awarded its 20 licenses and that it would be difficult to recover damages against the City because "it is not possible to measure lost profits in the context of a start-up business in a new

market." Pls.' Mot. 14. The Plaintiffs further point to the "unique and fleeting business opportunity offered by [participating in] Portland's retail marijuana market at the moment of its creation," arguing that an inability to take advantage of that opportunity would injure their economic prospects and their ability "to establish goodwill" in the new market. Pls.' Mot. 15-16.

I agree that the unique context of this new market suggests that the timing of a ruling in the Plaintiffs' favor is particularly important. The Plaintiffs are not seeking to enter an established market, where the significance of any further delay of their participation is likely diminished. Rather, the Plaintiffs are seeking to be in the first wave of licensees as a new market launches and are hoping to attract customers who have not yet developed allegiances. The City counters that the Plaintiffs' asserted harm could "easily be remedied by further government action" and is thus not irreparable.[17] Def.'s Mot. 18. But that still misses the point about timing. *26 Because protracted litigation could exacerbate the harm to the Plaintiffs by extending and calcifying a competitive disadvantage and because such harm is difficult to quantify, I conclude that the Plaintiffs have identified an irreparable injury.

[17] The City also attempts to argue that the Plaintiffs will not suffer any harm to their goodwill because the Plaintiffs will be able to continue to operate their medical marijuana dispensaries. Def.'s Mot. 18. But the Plaintiffs' continued operation of those dispensaries does not mean they will not miss out on establishing goodwill in an entirely new market. ——

Next, I consider the balance of the hardships on the parties. The hardship to the Plaintiffs if I decline to issue a preliminary injunction must be weighed against the hardship to the public—if the preliminary injunction is granted. See Nken v. Holder, 556 U.S. 418, 435 (2009) (harm to opposing party and public interest merge when government is party).

The City contends that, "[i]f an injunction is granted, none of the City's adult use marijuana retail hopefuls will be able to move forward with their business plans and their licensing," potentially resulting in Portland falling behind the rest of the State's markets. Def.'s Mot. 19.

I agree that further delay of this licensing process is a harm to the City and the public. But the City does not explain why it cannot move forward with granting licenses using a points matrix that omits the factors related to residency—or perhaps retools those factors to omit the discriminatory elements. In other words, the City has not identified any reason why the residency preference factors are not severable from the rest of the licensing scheme. See Kittery Retail Ventures, LLC v. Town of Kittery, 856 A.2d 1183, 1190 (Me. 2004) ("An invalid portion of a statute or an ordinance will result in the entire statute or ordinance being void only when it is such an integral portion of the entire statute or ordinance that the enacting body would have only *27 enacted the legislation as a whole."). Moreover, the City and the public could also face hardship if I deny the Plaintiffs' motion and later hold that the points matrix is unconstitutional. In that case, the City might have to alter its licensing scheme by issuing an additional license to Wellness, perhaps in excess of the 20-license limit that the City deems important for preventing over-saturation of the market. See Def.'s Mot. 1. I conclude that the harm to the Plaintiffs outweighs the harms that the City has identified.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for a preliminary injunction (ECF No. 4). The City is preliminarily enjoined from applying two criteria in the points matrix as currently written: the factor that gives five points to entities that are at least 51% owned by individual(s) who have been a Maine resident for at least five years and the factor that awards four points to entities that are owned by individual(s) who have previously been licensed by the State of



Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of five years. The Court **DENIES** the Defendant's motion to dismiss (ECF No. 7). SO ORDERED.

/s/ Nancy Torresen

United States District Judge Dated this 14th day of August, 2020.


casetext

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

NORTHEAST PATIENTS GROUP,
et al.,

    Plaintiffs,

v.

MAINE DEPARTMENT OF
ADMINISTRATIVE AND
FINANCIAL SERVICES, et al.,

    Defendants.

Docket No. 1:20-cv-00468-NT

## ORDER ON CROSS-MOTIONS FOR JUDGMENT

Plaintiffs High Street Capital Partners, LLC ("**High Street**") and Northeast Patients Group d/b/a Wellness Connection of Maine ("**Wellness Connection**") allege that Maine's medical marijuana licensing program violates the dormant Commerce Clause by restricting licenses to residents and resident-owned entities. The Plaintiffs have sued the Maine Department of Administrative and Financial Services ("**the Department**" or "**DAFS**") and the Department's Commissioner, Kirsten Figueroa.[1] Both parties have moved for judgment on a stipulated record (ECF Nos. 14 and 17). I held oral argument via videoconference on July 16, 2021 (ECF No. 25). For the reasons set forth below, the Plaintiffs' motion is **DENIED** as to the Department and **GRANTED** as to Commissioner Figueroa, and the Defendants' motion is **DENIED**.

---

[1]    The Complaint mistakenly captioned the Commissioner's first name as "Kristine." *See* Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot for J. on the Record ("**Defs.' Mot.**") 1 n.1 (ECF No. 17).

## BACKGROUND

In 2009, the Maine Legislature amended the State's existing medical marijuana law to establish a comprehensive system authorizing the sale of medical marijuana. Defs.' Opp'n to Pls.' Mot. for J. on the Record and Cross-Mot. for J. on the Record ("**Defs.' Mot.**") 2 (ECF No. 17). The current iteration of the law—the Maine Medical Use of Marijuana Act (the "**Act**")—authorizes qualified patients who have a certification from a medical provider for the medical use of marijuana to possess, use, and purchase medical marijuana. Defs.' Mot. 3; 22 M.R.S.A. § 2423-A. The Act also authorizes two types of entities—registered dispensaries and caregivers—to possess, cultivate, and sell marijuana to qualified patients. Defs.' Mot. 3; 22 M.R.S.A. §§ 2423-A(2), 2428. While dispensaries and caregivers can engage in similar activities, dispensaries—by statutory design—engage in operations that are much larger than caregivers. For example, caregivers are limited in the number of plants that they can grow and sell, *see* 22 M.R.S.A. § 2423-A(2), whereas dispensaries can grow an unlimited amount, *see* 22 M.R.S.A. § 2428(1-A). As of February 2021, there were approximately 3,000 caregivers in the State, and seven dispensaries. Pls.' Br. in Supp. of J. on the Record ("**Pls.' Mot.**") 3–4 (ECF No. 14). Caregivers accounted for 76 percent of retail sales as of February 2020, with dispensaries accounting for the remaining 24 percent. Pls.' Mot. 3–4. Together, the medical marijuana industry generated over $110 million in sales in 2019. Compl. ¶ 1.

Although dispensaries can grow more marijuana plants, they are restricted in other ways, including the restriction that is at the center of this case. The Act provides

that "[a]ll officers or directors of a dispensary[2] must be residents of this State," (the "**Dispensary Residency Requirement**"). 22 M.R.S.A. § 2428(6)(H). "Officer or director" is defined as "a director, manager, shareholder, board member, partner or other person holding a management position or ownership interest in the organization." 22 M.R.S.A § 2422(6-B). "Resident of the State" is defined as "a person who is domiciled in the State." 22 M.R.S.A. § 2422(13-B).

Plaintiff High Street is a Delaware limited liability company entirely owned by residents of states other than Maine. Joint Stipulation of the Record ("**Record**") ¶ 1 (ECF No. 13-1). Plaintiff Wellness Connection owns and operates three of the seven registered dispensaries in Maine's medical marijuana program. Record ¶ 2. From June of 2010 until March of 2020, Wellness Connection operated as a mutual benefit nonprofit corporation without any equity ownership, but when Maine changed its law in 2020 to allow dispensaries to become for-profit companies, Wellness Connection converted to a for-profit corporation and is currently wholly owned by three Maine residents. Record ¶¶ 3–5. High Street states that it would purchase all of the equity in Wellness Connection if the Dispensary Residency Requirement did not prohibit it from doing so.

The Plaintiffs sued the Department—which is responsible for implementing, administrating, and enforcing the Act—and Kirsten Figueroa, who is the

---

[2]   A "dispensary" is defined as "an entity registered under section 2425-A that acquires, possesses, cultivates, manufactures, delivers, transfers, transports, sells, supplies or dispenses marijuana plants or harvested marijuana or related supplies and educational materials to qualifying patients and the caregivers of those patients." 22 M.R.S.A. § 2422(6).

Commissioner of DAFS. *See* Record ¶¶ 7–8. The Plaintiffs allege that the Dispensary Residency Requirement violates the dormant Commerce Clause because it explicitly discriminates against residents of other states and Maine cannot show a legitimate local purpose for the requirement.

United Cannabis Patients and Caregivers of Maine ("**United Cannabis**") intervened in this case. (ECF Nos. 11, 16.) United Cannabis opposes the Plaintiffs' motion for judgment and partially opposes the Defendants' motion. *See* ECF Nos. 20, 22.

## LEGAL STANDARD

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3; *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). Although the Commerce Clause only contains an affirmative grant of power, "[o]ver time, courts have found a negative aspect embedded in this language—an aspect that prevents state and local governments from impeding the free flow of goods from one state to another." *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 184 (1st Cir. 1999). This "dormant Commerce Clause" prohibits "protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 10 (1st Cir. 2007) (internal quotations omitted); *see also Davis*, 553 U.S. at 337–38. The dormant Commerce Clause is intended "to effectuate the Framers' purpose to prevent a State from retreating into the economic isolation . . . that had plagued relations among the Colonies and later

4

Case 1:20-cv-00468-NT   Document 26   Filed 08/11/21   Page 5 of 13   PageID #: 255

among the States under the Articles of Confederation." *Davis*, 553 U.S. at 337–38 (internal quotations and citations omitted and alterations adopted).

To this end, a state or local law that "discriminates on its face against interstate commerce, whether in purpose or effect, demands heightened scrutiny." *Wine & Spirits Retailers*, 481 F.3d at 10. I must invalidate such a law "unless it furthers a legitimate local objective that cannot be served by reasonable non-discriminatory means."[3] *Id.* at 10–11; *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) ("[A] state law [that] discriminates against out-of-state goods or nonresident economic actors . . . can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose.") (internal quotations omitted and alterations adopted). The plaintiff bears the initial burden of showing discrimination, but the state or local government bears the burden of identifying legitimate local purposes and establishing a lack of non-discriminatory alternatives. *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010).

Importantly, congressional action can alter the application of the dormant Commerce Clause. As the Supreme Court recently stated, "[d]ormant Commerce Clause restrictions apply only when Congress has not exercised its Commerce Clause power to regulate the matter at issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. at 2465. Thus, Congress "may use its powers under the Commerce Clause to

---

[3]  Statutes that "regulate[ ] evenhandedly and ha[ve] only incidental effects on interstate commerce engender[ ] a lower level of scrutiny." *Wine & Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 11 (1st Cir. 2007) (internal quotations omitted). Such statutes "will stand 'unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (alteration in original) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

'[confer] upon the States an ability to restrict the flow of interstate commerce that they would not otherwise enjoy.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982) (alteration in original) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 44 (1980). The standard for finding such congressional consent is "high," and the state has the burden of demonstrating Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 570 (1st Cir. 1996); *see also Maine v. Taylor*, 477 U.S. 131, 138–39 (1986) ("[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'"); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 430–32 (3d Cir. 2011).

## DISCUSSION

### I.    Claims Against the Department

As a threshold issue, the Defendants assert that the Department is immune from suit under the Eleventh Amendment because it is an "arm of the state." Defs.' Mot. 2, 15–17. The Plaintiffs did not respond to this argument in their opposition brief.[4]

---

[4]    The Intervenor opposed the Defendants' motion for judgment, but their opposition focuses solely on whether the claims against *Commissioner Figueroa* are barred by the Eleventh Amendment. *See* Intervenor's Opp'n to Defs.' Cross-Mot. for J. on the Record 1–2 (ECF No. 22). The Defendants' motion, however, only argues that the *Department* is immune from suit.

I agree that the Department is shielded from suit in federal court. "Long interpreted as an affirmation of state sovereign immunity," the Eleventh Amendment bars individuals—regardless of their citizenship—from bringing a federal court action against a state, "including instrumentalities of the state, such as state agencies." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 138 (1st Cir. 2015) (quotations and citations omitted); *see also PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2258 (2021). By statute, the Department "is established as the principal fiscal department of State Government." 5 M.R.S.A. § 281. It is responsible for "coordinat[ing] financial planning and programming activities of departments and agencies of the State Government for review and action." *Id.* Like other Maine agencies, the Department is not "independent and separate," but rather is an arm of the State shielded by the Eleventh Amendment from suit in federal court. *See Abdisamad v. City of Lewiston*, No. 2:19-CV-00175-LEW, 2019 WL 2552194, at *2 (D. Me. June 20, 2019) (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & the Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 63 (1st Cir. 2003)) (holding that the Maine Department of Agriculture, Conservation and Forestry is an arm of the State); *United Cannabis Patients & Caregivers of Me. v. Me. Dep't of Admin. & Fin. Servs.*, No. 1:20-cv-00388-NT, 2021 WL 1581767, at *5 (D. Me. Apr. 22, 2021). No party argues that the State has consented to suit against the Department in this context or that the State's sovereign immunity has otherwise been abrogated. I conclude that the Plaintiffs' claims against the Department must fail.

7

In addition to claims against the Department, the Plaintiffs seek injunctive relief against the Commissioner. The State does not contend that these claims are barred by sovereign immunity, *see Ex parte Young*, 209 U.S. 123, 159–60 (1908); *O'Connor*, 786 F.3d at 138–39, so I go on to address the merits of the Plaintiffs' claims against the Commissioner.

## II.   Claims Against the Commissioner

This case raises a novel question, and it involves a unique scenario in the Commerce Clause realm. The Controlled Substances Act ("**CSA**") makes it unlawful under federal law "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841. Marijuana is classified as a Schedule I drug under the CSA. 21 U.S.C. § 812(c)(Schedule I)(c)(10). Although Congress has barred the Department of Justice from using funds "to prevent any [state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana," *see* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 § 531, 134 Stat. 1182, 128283 (2020) ("**Rohrabacher-Farr Amendment**"), Congress has not amended the CSA to legalize marijuana for either medical or recreational use. And the Supreme Court has held that the CSA is a valid exercise of Congress's Commerce Clause power, even where it criminalizes the cultivation and possession of marijuana for personal use. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). What this means, then, is that the federal government could prosecute various actors in Maine's medical marijuana industry at any time.

Against this backdrop, the Plaintiffs recite traditional arguments about the dormant Commerce Clause. They assert that the Dispensary Residency Requirement violates the dormant Commerce Clause because it plainly favors Maine residents over residents of other states. Noting that Maine's medical marijuana industry is booming, Pl.'s Mot. 3, the Plaintiffs argue that the requirement "reserves . . . enormous economic opportunities . . . for long-term residents," excluding non-residents from participating in "the largest and most lucrative type of medical marijuana business[ ] in Maine," Pls.' Mot. 7–8. And the Plaintiffs emphasize that the requirement "facially discriminates against non-residents" and thus is "virtually per se invalid." Pl.'s Mot. 8 (quoting *Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 575 (1997)).

The Defendants and Intervenor emphasize the unique context of *this* dormant Commerce Clause challenge. At oral argument, the Defendants pointed out that, at its core, the dormant Commerce Clause is not about protecting individual rights but rather about preserving a national market and prohibiting state laws that interfere with that national market. The Defendants do not argue that there is any justification for the Dispensary Residency Requirement that could overcome a constitutional challenge. Rather, they argue that Congress has eliminated the national market for marijuana and thus there is no national market with which Maine can interfere.[5]

---

[5]   The Defendants contend that the Supreme Court's decision in *General Motors Corp. v. Tracy* "provides a roadmap . . . and confirms that the dormant Commerce Clause should not be applied to a state market without considering the doctrine's inherent purpose." Defs.' Mot. 8 (citing 519 U.S. 278 (1997)). More specifically, the Defendants argue that, because the dormant Commerce Clause's "fundamental objective is preserving a national market for competition," Defs.' Mot. 9 (quoting *Tracy*, 519 U.S. at 299), there can be "nothing left for the dormant Commerce Clause to protect" where "Congress has eliminated [that] market," *id.*

Case 1:20-cv-00468-NT   Document 26   Filed 08/11/21   Page 10 of 13   PageID #: 260

Defs.' Mot. 4, 6–7. In other words, the Defendants argue that, "[i]n the most 'active' way imaginable, Congress has flexed its Commerce Clause powers and placed marijuana proprietors on notice that they enjoy no federal protections in the interstate market—because there is no such market."[6] Defs.' Mot. 9–10. And thus, the Defendants contend, the Dispensary Residency Requirement does not violate the dormant Commerce Clause.[7]

The Defendants' argument is not without logic, but I see several issues with it. First, the notion that the medical marijuana industry in Maine is wholly intrastate does not square with reality. Maine does not prevent qualified nonresidents from purchasing marijuana for medical use at Maine facilities, *see* 22 M.R.S.A. § 2423-D.

---

I agree that the dormant Commerce Clause's purpose is important, but I find *Tracy* to be distinguishable. In that case, the Supreme Court upheld a state law that taxed out-of-state natural gas marketers differently from state-regulated natural gas utilities. 519 U.S. at 293, 299. After a detailed review of the development of the natural gas retail market, the Court held that these two entities were not comparable for dormant Commerce Clause purposes because the requirements placed on local suppliers meant that they were essentially providing a different, bundled product. *Id.* at 297–98. With different products, the Court explained, "there is a threshold question whether the companies are indeed similarly situated for constitutional purposes" because a "difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *Id.* at 299. In other words, eliminating the "regulatory differential [may] not serve the dormant Commerce Clause's fundamental objective." *Id.* Here, the Plaintiffs are trying to break into Maine's existing medical marijuana market and compete directly with resident-owned entities. There is no indication that they would be providing a fundamentally different product. Given the reality that an interstate market for medical marijuana does seem to exist despite the Controlled Substances Act ("CSA"), eliminating the Dispensary Residency Requirement *would* serve the dormant Commerce Clause's fundamental objective by "preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

[6]   At oral argument, the Defendants added that, from a practical stand point, it would not make sense for Congress to criminalize the interstate market while also offering parameters that would permit it—such as by making it expressly clear that states can treat resident and nonresident actors differently.

[7]   The Intervenor took a slightly different approach. It contends that there is nothing "dormant" about Congress's Commerce Clause power in this context where Congress "has exercised its affirmative Commerce Clause powers to exclude marijuana from any national market of interstate commerce." Intervenor's Opp'n to Pls.' Mot. for J. on the Record 6 (ECF No. 20).

Nor does Maine seem to prohibit nonresidents who purchase marijuana here from taking it home with them. And Maine appears to allow nonresidents to participate in some aspects of the medical marijuana market.[8] *See, e.g.*, 22 M.R.S.A. § 2423-F (law governing marijuana extraction facilities not limited to residents).

Second, the Defendants have the burden of showing Congress's "unmistakably clear intent to allow otherwise discriminatory regulations." *United Egg Producers*, 77 F.3d at 570. The CSA says nothing about eliminating a national market, but merely criminalizes various acts of possession, manufacture, and distribution of controlled substances.[9] The Rohrabacher-Farr Amendment further muddies the question of congressional intent.

Finally, the Defendants cite no authority for their position. Instead, in apparently all cases where federal courts have confronted dormant Commerce Clause challenges to state or local laws that favor residents in the recreational or medical marijuana context, the courts have held that such laws are likely unconstitutional.[10]

---

[8]  In addition, because the Defendants have declined to enforce the residency requirement for adult-use marijuana licenses after a legal challenge, *see* Stipulation of Dismissal, *NPG, LLC, et al. v. Dep't of Admin. and Fin. Servs., et al.*, No. 1:20-cv-00107-NT (May 11, 2020) (ECF No. 9), nonresidents are currently able to participate in that market too.

[9]  The Defendants argue that the CSA made marijuana contraband. But, as with their argument regarding Congress's "elimination[]" of the marijuana market, they cite no authority holding that a product that is contraband under federal law but a valuable commodity under state law is outside the scope of the dormant Commerce Clause.

[10]  One court recently reached a different resolution. In *Original Investments, LLC v. Oklahoma*, the district court dismissed the plaintiff's dormant Commerce Clause challenge to an Oklahoma statute that prohibits nonresidents from obtaining medical marijuana business licenses and from owning more than 25 percent of any such licensed entity. Case No. CIV-20-820-F, 2021 WL 2295514 (W.D. Okla. June 4, 2021). Sidestepping the dormant Commerce Clause issue, the court held that it should not use its equitable power to facilitate conduct—namely enabling nonresidents to obtain licenses to sell medical marijuana—that is illegal under federal law. *See id.* at *3.

See *Toigo v. Dept. of Health and Senior Servs.*, No. 2:20-cv-04243-NKL (W.D. Mo. June 21, 2021) (ECF No. 25) (granting preliminary injunction enjoining state agency from restricting medical marijuana licenses to businesses that are majority-owned by persons who have been residents for more than one year because such a requirement was discriminatory on its face); *Lowe v. City of Detroit*, No. 21-CV-10709, 2021 WL 2471476 (E.D. Mich. June 17, 2021) (granting motion for preliminary injunction and holding that city ordinance that granted preferential treatment to long-time residents in awarding licenses was a form of economic protectionism that violated the dormant Commerce Clause); *NPG, LLC v. City of Portland*, No. 2:20-cv-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020).

These courts recognized that the law or ordinance at issue was "the sort of economic protectionism that the Supreme Court has long prohibited." *See Lowe*, 2021 WL 2471476, at *9 (citing *Davis*, 553 U.S. at 337–38). In those cases, as here, the defendants had not shown "unmistakably clear" intent from Congress to authorize states to discriminate in this way.[11] *See United Egg Producers*, 77 F.3d at 570; *see also South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87–88, 91–92 (1984) (explaining that the "requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine"). I have no authority to invent such an affirmative grant where

---

[11]   Although the CSA criminalizes marijuana, it does not affirmatively grant states the power to "burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).

Congress has not provided it. *See New England Power Co.*, 455 U.S. at 343 ("[W]hen Congress has not expressly stated its intent and policy to sustain state legislation from attack under the Commerce Clause, . . . [courts] have no authority to rewrite its legislation based on mere speculation as to what Congress probably had in mind." (internal quotations and citations omitted)).

I recognize that none of the courts that have confronted this specific constitutional issue have rendered final judgments, and it also seems that no circuit court has addressed it. But given the Supreme Court's and First Circuit's unmistakable antagonism towards state laws that explicitly discriminate against nonresident economic actors, I conclude that the Dispensary Residency Requirement violates the dormant Commerce Clause.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for judgment on the stipulated record as to Defendant Figueroa, **DISMISSES** the claims against Defendant DAFS, and **DENIES** the Defendants' motion for judgment on the stipulated record. The Commissioner shall be enjoined from enforcing the Dispensary Residency Requirement.

SO ORDERED.

Dated this 11th day of August, 2021.

/s/ Nancy Torresen
United States District Judge

13

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL LOWE,

Plaintiff,                            Civil Action No. 21-CV-10709

vs.                                   HON. BERNARD A. FRIEDMAN

CITY OF DETROIT,

Defendant.

_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

This matter is presently before the Court on plaintiff's motion for a preliminary injunction [docket entry 4]. Defendant has responded and plaintiff has replied. An amicus brief has also been filed by a coalition of individuals and entities that oppose plaintiff's motion.[1] On May 27, 2021, the Court heard oral argument. As explained more fully below, the Court shall grant plaintiff's motion for a preliminary injunction because the city ordinance governing the process for obtaining a recreational marijuana retail license gives an unfair, irrational, and likely unconstitutional advantage to long-term Detroit residents over all other applicants.

Plaintiff challenges the recreational marijuana licensing ordinance (the "Ordinance") adopted by the City of Detroit ("the City") under both the United States and Michigan constitutions. The allegedly unconstitutional provisions of the Ordinance grant preferential treatment to "Detroit

---

[1] The amici include the following individuals and entities: Beyond Equity, LLC; Cannaclusive, LLC; Chicago NOORML; Green Believers, LLC; The Hood Incubator, LLC; Jessica Jackson; Shauntay Williams; Kourtney Ketterhagen; Ronald Bartell; Tiff Massey; Mitzi Ruddock; and Jonathan Ray. *See* PageID.524.

legacy" applicants (i.e., those who have lived in Detroit for at least ten years) for the following recreational marijuana licenses: "adult-use retailers, adult-use processors, adult-use growers, designated consumption establishments, microbusinesses, and marijuana event organizers."[2] Ordinance §§ 20-6-2, 20-6-31(d), 20-6-35. Plaintiff, who does not qualify as a Detroit legacy applicant, intends to apply for an adult-use marijuana retail license and argues that the challenged provisions (1) violate her right to equal protection under the Michigan Constitution; (2) punish her for exercising her fundamental right to inter- and intrastate travel, as guaranteed by the Michigan Constitution; and (3) violate the dormant Commerce Clause of the United States Constitution. *See* Compl. ¶¶ 11, 50-58.

This case was commenced in Wayne County Circuit Court on March 2, 2021, and was removed to this Court on March 30, 2021. The City of Detroit was scheduled to begin accepting recreational marijuana license applications on April 1, 2021. *See* Ordinance §20-6-36(c). However, plaintiff filed a motion for a temporary restraining order and preliminary injunction on April 1, 2021, requesting that the Court temporarily halt Detroit's recreational marijuana licensing process until plaintiff's constitutional challenges are resolved. *See* docket entry 4. The Court held a hearing on April 7, 2021, at the conclusion of which the Court granted plaintiff's motion for a temporary restraining order and established a briefing and oral argument schedule for the motion for a preliminary injunction. *See* docket entry 9.

In the instant motion, plaintiff argues that the Ordinance's Detroit legacy licensure provisions (described in further detail below) give an unfair preference to long-time Detroit residents – individuals who have lived in the City for at least 10-15 of the past 30 years. While applicants

---

[2] Each of these different licenses is defined in § 20-6-2 of the Ordinance.

who have lived in Detroit for at least 15 of the past 30 years automatically qualify for legacy status; applicants who have resided in the City for 10-14 of the past 30 years must meet additional conditions to qualify – i.e., be low-income, have a marijuana-related criminal record, or have a parent with a marijuana-related criminal record.[3] As to the parent-drug-offense condition, the offense must have occurred while the applicant was a minor. The licensure scheme provides a six-week early application period exclusively for legacy applicants, during which time the City may accept, review, and approve legacy applications prior to non-legacy applications. The Ordinance also reserves at least fifty percent of all relevant recreational marijuana licenses for legacy applicants. *See* Ordinance § 20-6-31(d). Some of the licenses are further limited by numerical caps. For example, recreational marijuana adult-use retail licenses are capped at 75 licenses.

Plaintiff is 33 years old and has lived in Detroit for 11 of the past 30 years. Prior to moving to Detroit, she lived in River Rouge, a bordering community, and spent time living out of state, "including with her then-husband while he was on military duty." Pl.'s Br. at 9. Although plaintiff's mother was charged with a marijuana-related offense in 2007, plaintiff was above the age of eighteen at that time. *See id.* at 2. Plaintiff therefore does not qualify as a Detroit legacy applicant.

I. **The Ordinance**

The stated purpose of the Ordinance is "to promote equitable ownership and employment opportunities in the cannabis industry in order to decrease disparities in life outcomes

---

[3] The Ordinance uses the term "prior controlled substance record," which it defines as someone who has "been convicted, or adjudged to be a ward of the juvenile court, for any crime relating to the sale, possession, use, cultivation, processing, or transport of marijuana prior to November 7, 2018." Ordinance § 20-6-2.

for marginalized communities and to address the disproportionate impacts of the War on Drugs in those communities." *Id.* at 5-6 (quoting Pl.'s Ex. C (Mem. from Brenda Jones, Council President)).

To this end, the City developed a licensure application process that prioritizes Detroit legacy applicants. *See id.* at 6. This prioritized class of applicants includes the following:

> [A]n individual who has, or an entity that is at least 51% owned and controlled by one or more individuals who have, as certified by the Civil Rights, Inclusion, and [O]pportunity Department, been a City of Detroit resident at the time of application for at least one year, and upon renewal, and additionally has been:
>
> (1) a City of Detroit resident for 15 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure; or
>
> (2) a City of Detroit resident for 13 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and is a low income applicant at the time of application, as defined in this Section; or
>
> (3) a City of Detroit resident for the 10 of the past 30 years preceding the date of application, and continues to so reside throughout the period of licensure, and has a prior controlled substance record, as defined in this section, or a parent with a prior controlled substance record as defined in this section under the following circumstances:
>
> > (i) the parent is named on the applicant's birth certificate, and the parent's conviction took place before the applicant's 18th birthday; or
> >
> > (ii) the parent has claimed the applicant as a dependent regularly on federal income tax filings, and the parent's conviction took place before the applicant's 18th birthday.

*Id.* at 6-7 (quoting Ordinance § 20-6-2). "The Ordinance imposes a 75-license cap on the number of available adult-use marijuana retailer licenses" and mandates that at least fifty percent of those

4

Case 2:21-cv-10709-BAF-CI   ECF No. 17, PageID.649   Filed 06/17/21   Page 5 of 19

licenses be awarded to Detroit legacy applicants.[4] *Id.* at 7. Further, plaintiff notes that

> [t]o facilitate its preference for "Detroit legacy applicants," the Ordinance provides that applications for adult-use marijuana establishment licenses shall be submitted from April 1, 2021 to April 30, 2021. "From May 1, 2021 through June 15, 2021 there will be a reserved review period wherein the City will review and may approve applications for adult-use marijuana establishment licenses from Detroit legacy applicants[.]" . . . After [the] reserved review periods have ended, "the City will review and may approve applicants for adult-use marijuana establishment licenses from any applicant."

*Id.* at 7-8 (quoting Ordinance § 20-6-35) (citations omitted). As of the filing of plaintiff's motion

for a preliminary injunction, the City of Detroit had certified over 400 legacy applicants. *See id.* at

8.  That is to say, as of April 1, 2021, the City had determined that 400 applicants were entitled to

the legacy preference.

Because of the tiered approach to application submission and review, and because

it is unclear whether any licenses are reserved for non-legacy applicants, the 400 certified Detroit

legacy applicants could be awarded all 75 recreational marijuana retail licenses. Even if half of the

licenses are reserved for non-legacy applicants, plaintiff contends that it would be unconstitutional

to categorically bar such applicants, including herself, from eligibility for half of the 75 total

licenses. *See* Pl.'s Reply Br. at 1, 6.

---

[4] The number of licenses that must or may be issued to legacy applicants is unclear. When this suit was filed, the Ordinance stated that "[n]o less than 50% of licenses" would be awarded to legacy applicants. Ordinance §§ 20-6-31(d), 20-6-35(f). This language, combined with the six-week early application and review period for legacy applicants, allows for the possibility that at least 50% and perhaps 100% of the licenses could be awarded to legacy applicants. Defendant attached an amended version of the Ordinance as an exhibit to its answer to plaintiff's complaint, in which the phrase "[n]o less than" is deleted, thus mandating a 50-50 ratio between legacy and non-legacy licensees. *See* Def.'s Ex. 2. Nonetheless, on the City of Detroit website, the Ordinance still includes the "[n]o less than" language. *See* https://detroitmi.gov/sites/detroitmi.localhost/files/2020-11/11-17-2020%20%20Adult-Use%20Marih uana%20Licensing%20Amendment%20to%20Chapter%2020.pdf (last visited June 15, 2021).

## II.   Legal Standard

The Sixth Circuit has stated that

[i]n general, courts must examine four factors in deciding whether to grant a preliminary injunction: (1) whether the movant has demonstrated a substantial likelihood of success on the merits, (2) whether the movant will suffer irreparable injury absent injunction, (3) whether a preliminary injunction would cause substantial harm to others, and (4) whether the public interest will be served by an injunction. These factors are not prerequisites, but are factors that are to be balanced against each other.

*Flight Options, LLC v. Int'l Bhd. of Teamsters, Loc. 1108,* 863 F.3d 529, 539-40 (6th Cir. 2017)

(citation omitted).  Further,

[t]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion because a preliminary injunction is an extraordinary remedy. The party seeking the preliminary injunction bears the burden of justifying such relief . . . .

*McNeilly v. Land,* 684 F.3d 611, 615 (6th Cir. 2012) (internal quotation marks and citation omitted).

## III.   Likelihood of Success on the Merits

### A.   Equal Protection Claim under the Michigan Constitution

The Michigan Supreme Court has stated that

the right to engage in business is subject to the state's police powers to enact laws in furtherance of the public health, safety, welfare, and morals. Accordingly, when legislation is challenged on due-process and equal protection grounds because of its interference with economic or business activity, the challenger must establish either that no legitimate public purpose is served by the legislation or that there is no rational relationship between the provisions and a legitimate public purpose. Thus, there is a two-step inquiry: (1) whether there is a legitimate public purpose and, if so, (2) whether there is a rational relationship between the legislation and the public purpose sought to be achieved.

*Murphy-DuBay v. Dep't of Licensing & Regul. Aff.,* 876 N.W.2d 598, 604 (Mich. 2015).

6

Plaintiff argues that she is likely to succeed on her equal protection challenge because "favor[ing] local merchants" is an illegitimate public purpose. Pl.'s Br. at 13 (citing *Colonial Baking Co. of Grand Rapids v. City of Fremont*, 295 N.W. 608, 610 (Mich. 1941)). Plaintiff contends that the legacy licensing scheme "creates precisely the type of durational residency preference that offends Michigan's Constitution. It facially discriminates against both Michiganders who live outside of Detroit and Michiganders who have lived in Detroit for less than 10 to 15 of the past 30 years." *Id.* at 14. She adds that the Ordinance only serves the illegitimate purpose of "pure economic protectionism." *Id.*

In response, defendant argues that "[b]ecause 'statutes are presumed to be constitutional,' courts reviewing equal protection claims under the Michigan Constitution 'exercise the power to declare a law unconstitutional with extreme caution, and . . . never exercise it where serious doubt exists with regard to [the legal] conflict'" between the statute and the constitution. Def.'s Resp. Br. at 14 (quoting *Phillips v. Mirac, Inc.*, 685 N.W.2d 174, 179 (Mich. 2004) (noting that "it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity'")). Defendant further argues that because "[p]laintiff's equal protection challenge does not allege discrimination based on . . . race, national origin, ethnicity, gender, or illegitimacy, . . . the correct standard of review is rational-basis." *Id.* (internal quotation marks omitted). Defendant cites the Michigan Supreme Court decision in *Crego v. Coleman*, 615 N.W.2d 218 (Mich. 2000), to support its argument that

> [u]nder rational-basis review, courts will uphold legislation as long
> as that legislation is rationally related to a legitimate government
> purpose. To prevail under this highly deferential standard of review,
> a challenger must show that the legislation is arbitrary and wholly

7

unrelated in a rational way to the objective of the statute. . . . Rational-basis review does not test the wisdom, need, or appropriateness of the legislation, or whether the classification is made with mathematical nicety, or even whether it results in some inequity when put into practice. Rather, the statute is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption.

*Id.* at 224 (internal quotation marks and citations omitted).

Defendant contends that the challenged provisions within the City Ordinance bear a rational relationship to a legitimate governmental purpose: "[r]eversing the disproportionate[ly] harmful impact of federal drug policies and enforcement actions," as expressed in the Michigan Regulation and Taxation of Marijuana Act ("MRTMA"). Def.'s Resp. Br. at 1. Defendant states that 42 of the 46 licenses for medical marijuana dispensaries were awarded to applicants who are not City of Detroit residents, and notes that neither the Michigan Medical Marijuana Act (MICH. COMP. LAWS § 333.26421) nor the related City ordinance contains a provision calling for a preference to be given to Detroit legacy applicants. *See id.* at 3–4. Learning from this experience, the City of Detroit structured the recreational marijuana ordinance so as to "assist residents who have been most harmed by the criminalization of marijuana-related conduct and to limit the monopolization of adult-use licenses by those who have not experienced the systemic effects of the War on Drugs, which began in earnest in the 1990s." *Id.* at 4. This is the justification given for reserving at least half of adult use recreational marijuana licenses for Detroit legacy applicants. *See id.* at 5, 12.

Defendant contends that "[t]he number of legacy certifications has no impact on the

8

number of licenses issued to either pool of applicants'"—legacy or non-legacy.[5]  *Id.* at 5.  Defendant

further argues that the Ordinance's prioritization of legacy applicants does not reflect favoritism

toward them, but rather was intended to provide this presumably less sophisticated applicant pool

additional time to complete the licensure process.  *See id.* at 6.

**B.**    **Right to Travel Claim under the Michigan Constitution**

As to plaintiff's right to travel claim, she states that

> [t]he right to travel has three components: [1] it protects the right of
> a citizen of one state to enter and leave another state[,] [2] it protects
> the right to be treated as a welcome visitor rather than an unfriendly
> alien when temporarily present in the second state[, and] [3] for those
> travelers who elect to become permanent residents, it protects the
> right to be treated like other citizens of that state.

Pl.'s Br. at 14-15 (quoting 5 Mich. Civ. Jur. Const. Law § 243).  She contends that "[t]he Michigan

Constitution protects a state right to intrastate travel comparable to the federal right to interstate

travel."  *Id.* at 15.

The Sixth Circuit has drawn a distinction between the rights to inter- and intrastate

travel under the United States Constitution, with the former triggering strict scrutiny and the latter

triggering rational basis review.  *See Wardell v. Bd. of Educ. of City Sch. Dist. of City of Cincinnati*,

529 F.2d 625, 628 (6th Cir. 1976).  However, the Michigan Court of Appeals has taken the

following approach to this distinction:

> Whether we characterize the right to travel as fundamental or as
> something less than fundamental, there can be no question that the
> right to travel between states has been acknowledged as a right
> implicit in the very concept of union. In *Grano v. Ortisi*, 86 Mich.

---

[5] As described in further detail in footnote 4, *supra*, the mandated ratio between legacy and
non-legacy applicants is unclear. In any event, non-legacy applicants are deprived of the opportunity
to apply for at least half of the available licenses.

9

App. 482, 272 N.W.2d 693 (1978), this Court discussed the concept of the right to travel within the context of the United States Constitution, Am. XIV, and the Michigan Constitution of 1963, art. I, § 2. The *Grano* Court made no distinction between the right to freedom of travel on an inter-state and intra-state basis and we see no logical distinction between the right of a person to travel between states (which is protected by the United States Constitution) and the right to travel between locations in the State of Michigan (which we find to be protected by the Michigan Constitution). The problem is identical and the analysis ought to be identical.

Our analysis of the above cases leads us to believe that the right to travel is classified as a fundamental constitutional right and that any statute which imposes a penalty on the exercise of this right must be viewed with strict scrutiny.

*Musto v. Redford Twp.*, 357 N.W.2d 791, 792-93 (Mich. Ct. App. 1984) (citations omitted). The Michigan Court of Appeals has further noted that

> [s]trict scrutiny applies when the law classifies based on "suspect" factors or when it interferes with a fundamental right. However, residency is not considered a suspect classification . . . . Although the right to travel intrastate is a fundamental right, that right is not affected by laws requiring residency during employment because they are distinguishable from durational residency laws which require residency for a period of time before applying for or obtaining a benefit.

*Akhtar v. Charter Cnty. of Wayne*, No. 233879, 2003 WL 327624, at *2 n.2 (Mich. Ct. App. Feb. 11, 2003).

Plaintiff contends that the Ordinance violates her rights to inter- and intrastate travel by imposing a prolonged waiting period on any applicant who has not lived in the City of Detroit for the requisite length of time. As to her case specifically, plaintiff argues that she is penalized both for having lived in River Rouge, Michigan, and for having lived out of state. She cites various cases for the proposition that prolonged residency requirements violate the right to travel by imposing a waiting period on new residents. *See, e.g., Musto*, 357 N.W.2d at 793 (finding that a one-year

residency requirement for police and fire applicants violated the right to travel)); *Barnes v. Bd. of Trustees Mich. Veterans Trust Fund*, 369 F. Supp. 1327, 1334 (W.D. Mich. 1973) (finding "that the classification involved in this case clearly penalizes the right to travel, as it mandates that an otherwise qualified person who has recently traveled must wait five years before he can obtain emergency aid and which could be immediately obtained by one who has not recently moved into the state""). *See* Pl.'s Br. at 15-16.

Plaintiff argues that regardless of the standard of review, she is likely to succeed on the merits because the Ordinance lacks a rational relationship to the stated governmental purpose of serving marginalized communities that were disproportionately affected by the War on Drugs.

She states that

> Detroit's purported justifications for residency preferences make little sense and amount to nothing more than a flimsy pretense for economic favoritism. Detroit has no rational or logical basis to assert that long-term residency requirements promote social equity, ensure that licensed business are sufficiently "invested" in [the] recreational marijuana industry, or increase compliance with MRTMA.

Pl.'s Br. at 17.

In response, defendant contends that residency requirements do not necessarily trigger strict scrutiny and that the Ordinance passes rational basis review. Defendant cites *Barrow v. City of Detroit Elec. Comm'n*, 836 N.W.2d 498, 508 (Mich. Ct. App. 2013), for its statement that "[c]aselaw since *Grano* compels the conclusion that strict scrutiny does not apply to [durational residency requirements] . . . [because] [r]esidency is . . . not one of the suspect classifications." 836 N.W.2d at 509; *see* Def.'s Resp. Br. at 18. Defendant argues that because the purpose of the challenged Ordinance is to further social equity, not to discourage inter- or intrastate travel, the Court should likewise apply rational basis review.

11

## C.   Dormant Commerce Clause Claim under the United States Constitution

The Supreme Court has stated that "[t]he modern law of what has come to be called

the dormant Commerce Clause is driven by concern about economic protectionism – that is,

regulatory measures designed to benefit in-state economic interests by burdening out-of-state

competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (internal quotation

marks and citation omitted).  Further,

> [a] discriminatory law is virtually *per se* invalid . . . and will survive
> only if it advances a legitimate local purpose that cannot be
> adequately served by reasonable nondiscriminatory alternatives.
> Absent discrimination for the forbidden purpose, however, the law
> will be upheld unless the burden imposed on [interstate] commerce
> is clearly excessive in relation to the putative local benefits.

*Id.* at 338-39 (emphasis in original, internal quotation marks and citations omitted).

The Supreme Court has recently noted that "[d]ormant Commerce Clause restrictions

apply only when Congress has not exercised its Commerce Clause power to regulate the matter at

issue." *Tenn. Wine & Spirits Retailers Ass'n*, 139 S. Ct. 2449, 2465 (2019).  Congress may thus

"use its powers under the Commerce Clause to [confer] upon States an ability to restrict the flow of

interstate commerce that they would not otherwise enjoy."  *New England Power Co. v. New*

*Hampshire*, 455 U.S. 331, 340 (1983) (internal quotation marks and citation omitted).  However,

the party asserting that Congress has exercised this power under the Commerce Clause bears the

burden of demonstrating that Congress's intent to allow otherwise discriminatory state regulation

is "unmistakably clear." *Maine v. Taylor*, 477 U.S. 131, 139 (1986).

Plaintiff contends that the Ordinance is facially discriminatory and is thus "'virtually

per se invalid' unless the City can show that it advances a legitimate local purpose that cannot be

adequately served by reasonably nondiscriminatory alternatives."  Pl.'s Br. at 20.  Plaintiff argues

12

that, as discussed above, defendant cannot make such a showing. Plaintiff adds that a recent decision from the District of Maine speaks directly to the issues presented in the instant motion. *See NPG, LLC v. City of Portland*, No. 20-CV-00208, 2020 WL 47419 (D. Me. Aug. 14, 2020). *NPG* involved a challenge to Portland, Maine's recreational marijuana licensure ordinance, which included a preference for applicants who have lived in the city, and/or held business licenses in the state, for at least five years. *See id.* at *1. The court in *NPG* granted plaintiffs' motion for a preliminary injunction, finding that the challenged provisions in the ordinance only served protectionist ends and were, therefore, likely unconstitutional. *See id.* at *11. Plaintiff notes that Detroit's Ordinance contains terms that are even more protectionist than those in the Portland ordinance, as it prioritizes Detroit residents who have lived in the City for at least 10-15 years. *See* Pl.'s Br. at 21.

In response, defendant contends that plaintiff is unlikely to succeed on the merits because "there is simply no interstate market for marijuana." Def's Resp. Br. at 1. In support of this argument, defendant cites the fact that states bordering Michigan (i.e., Ohio, Indiana, and Wisconsin) have yet to decriminalize recreational marijuana. *See id.* Defendant further argues that by continuing to ban marijuana at the federal level under the Controlled Substances Act of 1970, Congress is using its Commerce Clause powers to confer upon states an ability to restrict the flow of marijuana that they would not otherwise enjoy. *See id.* at 8-9. In defendant's view, marijuana therefore does not benefit from the protection of the dormant Commerce Clause. *See id.* Defendant adds that "[t]he City's social-equity goals are fundamentally different from the sort of pure economic protectionism the dormant Commerce Clause seeks to curtail." *Id.* at 12.

## IV.    Remaining Preliminary Injunction Factors

As to the remaining factors that the Court must consider when deciding whether to grant a motion for preliminary injunction, plaintiff argues that she will suffer irreparable harm by being excluded from the recreational marijuana market and that "there is likely no mechanism that would allow her to recover damages from the City given its governmental immunity." Pl.'s Br. at 23-24. She adds that the City of Detroit would not be harmed by being prevented from enforcing an unconstitutional ordinance, nor is the public interest served by proceeding with a likely unconstitutional ordinance – regardless of who ultimately prevails on the merits. *Id.* at 24.

In response, defendant contends that plaintiff fails to show how the Ordinance violates her constitutional rights and only speculates that she has been, or may be, denied an opportunity to compete for a license. Def.'s Resp. Br. at 20. Defendant adds that any sense of urgency is of the plaintiff's own making, as she could have filed this lawsuit earlier. *See id.* at 21. In contrast, defendant argues, the City and its social equity agenda would experience significant harm if enjoined from administering the Ordinance.

The Legacy Advocates, a mix of twelve entities and individuals "with substantial expertise [on] the roles and responsibilities required in the cannabis industry and the cannabis market," filed an amicus brief providing further information on the economic harm that might befall legacy applicants and their financial support networks if the Court were to grant plaintiff's motion for a preliminary injunction. *See* Amicus Br. at 6, 16 (citing Amicus Ex. A (Legacy Advocates Affidavits)). Some of these individuals have already invested between $50,000 to $200,000 in recreational marijuana projects or businesses in the City of Detroit and therefore could face significant financial loss if not awarded a license. *See id.*

**V.    Conclusion**

14

Having read the briefs submitted by the parties and the amici, reviewed the relevant case law, and listened to oral argument, the Court concludes that a preliminary injunction is warranted in this case. First, plaintiff has demonstrated a substantial likelihood that the challenged provisions of the Detroit Ordinance unconstitutionally discriminate against all applicants who have not lived in Detroit for at least 10-15 of the past 30 years, violate the fundamental right to inter- and intrastate travel, and impede interstate commerce. At a minimum, the Ordinance must pass rational basis review to be deemed constitutional under both the United States and Michigan constitutions.

However, the challenged provisions of the Detroit Ordinance do not appear to be rationally related to the stated purpose of rectifying the harm done to City residents by the War on Drugs. As plaintiff convincingly states in her brief:

> If the City were truly worried about equity, the Ordinance would target the individuals who need social equity treatment . . . . But instead, the Ordinance employs a class-based distinction based on duration of residency. It thus prefers wealthy applicants who have had no interaction with the War on Drugs to low-income applicants who have been ravaged by it, so long as the wealthy applicants have lived in Detroit for the right amount of time.

Pl.'s Br. at 17. As presently drafted, the Ordinance is far more protectionist than it is equitable.

Moreover, the Michigan Court of Appeals has repeatedly indicated that "durational residency laws which require residency for a period of time before applying for or obtaining a benefit" generally trigger strict scrutiny under the Michigan Constitution, as they violate the fundamental right to inter- and intrastate travel, and are generally disfavored.[6] *Akhtar*, 2003 WL

---

[6] There are exceptions to this general rule against durational residency requirements (e.g., for those seeking elective officials, for those filing for divorce, and for students seeking to pay in-state tuition). However, unlike the Ordinance's 10-15-year residency requirement to obtain a business license, these exceptions are generally short in length (approximately one year) and relate to benefits or privileges that are different from those at issue in this case. *See Barrow*, 836 N.W.2d at 509 (noting that the Detroit City Charter's one-year residency requirement to run for mayor "was meant

327624, at *2 n.2; *see also Barrow*, 836 N.W.2d at 511 (holding that durational residency requirements could trigger strict scrutiny if they infringe upon a fundamental right, like "the constitutionally based right to travel"). While there is no right to obtain a business license in the State of Michigan, there is a right to be considered for such a license "in a fair, reasonable and nondiscriminatory manner." *Musto*, 357 N.W.2d at 793. Given the Court's conclusion that plaintiff is likely to succeed on the merits under rational basis review, plaintiff's likelihood of success under strict scrutiny is even greater.

As to plaintiff's dormant Commerce Clause claim, the court in *NPG* addressed substantially similar constitutional arguments as the ones presently before this Court and concluded that a preliminary injunction was warranted. The recreational marijuana ordinance at issue in *NPG* proposed to award licenses using a points matrix that reserved up to nine of the available thirty-four points for those who resided in Portland, and/or held a business license in the State of Maine, for at least five years.[7] In granting plaintiffs' motion for a preliminary injunction, the court stated:

to make[ ] it more likely that elected officials will be intimately familiar with the unique issues impacting their communities"). *See also Saenz v. Roe*, 526 U.S. 489, 505 (1999) (distinguishing unconstitutional residency requirements (here, welfare) from those applicable to divorce or in-state tuition by highlighting the fact that the benefits gained from divorce or in-state tuition are enjoyed once individuals leave the state and may encourage non-residents to establish residency for the sole purpose of obtaining such benefits). Defendant cites no cases, and the Court is aware of none, suggesting that the granting of a business license may be conditioned on the applicant meeting a residency requirement of 10-15 years.

───────────────

[7] The matrix awarded five of the available thirty-four points to applicants who were majority owned by "individual(s) who have been a Maine resident for at least five years." *NPG, LLC*, 2020 WL 471913, at *2. Four additional points were awarded to applicants who were "[o]wned by individual(s) who have previously been licensed by the State of Maine or a Maine municipality for non-marijuana related business, with no history of violations or license suspensions or revocations for a minimum of 5 years." *Id.* The twenty applicants with the highest scores would be awarded municipal licenses. *See id.* Notably, the Portland ordinance also awarded six points to applicants who were majority owned "by socially and economically disadvantaged individual(s)." *Id.* However because the social equity provision was not intertwined with the residency-related provisions, unlike

16

As is clear from the text of the licensing scheme and the statements by councilmembers, the City sought to create a preference for resident-owned marijuana retail stores. Rather than disputing the discriminatory character of the residency preference factors, the City attempts to argue that the licensing of marijuana retail stores operates in a unique dimension, noting that [m]arijuana has been, and remains, a Schedule I drug under the [Controlled Substances Act].

\* \* \*

. . . . But the [Controlled Substances] Act nowhere says that states may enact laws that give preference to in-state economic interests. In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to burden interstate commerce in a manner which would otherwise not be permissible. . . . .

Because . . . the dormant Commerce Clause likely restricts the City's licensing of marijuana retail stores, the burden falls on the City to justify its licensing scheme. State laws that discriminate against interstate commerce face a virtually *per se* rule of invalidity. . . . The City would need to present[] concrete record evidence, and not sweeping assertions or mere speculation, to substantiate . . . claims that the discriminatory aspects of its challenged policy are necessary to achieve its asserted objectives.

. . . . At this stage, given the express language in the [ordinance] and the statements by City officials suggesting a protectionist purpose. . . . the City is unlikely to succeed in justifying the residency preference. . . . .

*Id.* at \*9-11 (emphasis in original, internal quotation marks and citations omitted).

Given the similarities between the constitutional questions raised by the Portland and Detroit recreational marijuana ordinances, the Court finds the reasoning expressed and conclusions drawn in *NPG* to be persuasive and applicable to the instant case. The Ordinance's facial favoritism toward Detroit residents of at least 10-15 years embodies precisely the sort of economic

in the Detroit Ordinance, the social equity provision was not at issue in *NPG*.

17

protectionism that the Supreme Court has long prohibited. *See Davis*, 553 U.S. at 337-38 (quoting *New England Co. of Limbach*, 486 U.S. 269, 273-74 (1988)). The City of Detroit thus bears the burden of demonstrating that the Ordinance's discriminatory provisions "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Davis*, 553 U.S. at 338. The City has failed to meet this burden.

In particular, defendant has failed to show that its stated goal of assisting those who have been harmed by the War on Drugs is advanced by reserving fifty percent or more of the recreational marijuana licenses for those who have lived in Detroit for at least ten years. Certainly, many people who have lived in Detroit for this period of time, or longer, have not been burdened with a marijuana-related arrest or conviction. And just as certainly, many people who have lived in Detroit for fewer than ten years have been significantly burdened by such an arrest or conviction. Giving "social equity" preference to the former group while denying it to the latter is irrational. It is also irrational to grant the preference to residents of Detroit but deny it to those of other communities, such as neighboring River Rouge, when residents of both cities presumably suffered from the War on Drugs to the same extent.

Finally, plaintiff has demonstrated that she will suffer irreparable injury absent an injunction, as she would, at best, be significantly disadvantaged in applying for a recreational marijuana retail license (assuming fifty percent of the licenses are reserved for legacy applicants) and, at worst, be entirely eliminated from consideration for such a license (if all of the licenses are awarded to legacy applicants). The Legacy Advocates' amicus brief and attached affidavits demonstrate that legacy applicants and their financial support networks may be economically harmed if the Detroit recreational marijuana licensure scheme is enjoined. However, any such economic harm would be the result of these applicants investing money before obtaining a license.

which they did at their own risk.  Moreover, the public interest is best served by enjoining the enforcement of an ordinance that is likely unconstitutional.  Accordingly,

IT IS ORDERED that plaintiff's motion for a preliminary injunction is granted.

Defendant is hereby enjoined from processing any applications for recreational marijuana licenses under the current Ordinance.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated:  June 17, 2021
Detroit, Michigan

19

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MARK TOIGO,

    Plaintiff,

    v.

DEPARTMENT OF HEALTH AND
SENIOR SERVICES, et. al.,

    Defendants.

Case No. 2:20-cv-04243-NKL

## ORDER

In 2018, Missouri voters approved Amendment 2 to the Missouri Constitution, legalizing medical marijuana in the state and directing the Missouri Department of Health and Human Services (DHSS) to create a regulatory regime for medical marijuana facilities. In 2019, DHSS promulgated regulations that required businesses to obtain licenses before they could operate medical marijuana facilities. As a condition of applying for and maintaining such a license, businesses must prove they are majority-owned by persons who have been Missouri residents for at least one year. Mark Toigo, a Pennsylvania resident, is a minority owner in Organic Remedies MO, Inc. (ORMO), a licensed marijuana dispensary. He wishes to invest additional capital and become a majority owner in ORMO but cannot because of the durational residency requirement. He also wishes to either apply for a license to operate a medical marijuana facility or purchase an already-issued license for himself but cannot because of the same requirement. He argues the durational residency requirement violates the Constitution's dormant commerce clause in that it discriminates against out-of-state commerce without being narrowly tailored to advance a legitimate local purpose.

Toigo has moved for a preliminary injunction, Doc. 15, enjoining DHSS and its acting director Robert Knodell from enforcing the durational residency requirement pursuant to 42 U.S.C. § 1983. Toigo represents that if Defendants were enjoined from enforcing the durational residency requirement, he would apply for a medical marijuana license, personally invest additional capital into ORMO and solicit additional investment from out-of-state individuals, and attempt to purchase an already-issued license. Doc. 15-1 at 2-3 (Toigo Affidavit). For the reasons discussed below, Toigo's Motion is granted.

## I. Preliminary Injunction Standard

In deciding whether to issue a preliminary injunction, the Court considers: (1) the likelihood that Plaintiff will prevail on the merits; (2) whether Plaintiff faces a threat of irreparable harm absent the injunction; (3) the balance between the harm Plaintiff faces and the injury that the injunction's issuance would inflict upon Defendants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). Preliminary injunctive relief is "an extraordinary remedy" and "the party seeking injunctive relief bears the burden of proving all the *Dataphase* factors." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

## II. Durational Residency Requirement

Article XIV, § 1.7(3) of the Missouri Constitution states:

All medical marijuana cultivation facility, medical marijuana dispensary facility, and medical marijuana-infused products manufacturing facility licenses, entities with medical marijuana testing facility certifications, and entities with transportation certifications shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one year prior to the application for such license or certification. Notwithstanding the foregoing, entities outside the state of Missouri may own a minority stake in such entities.

§ 1.7(3). An entity is defined as a "natural person", corporation, "or any other legal entity." § 1.2(3). The term "citizen" is not defined.

2

In 2019, DHSS issued regulations governing the medical marijuana industry authorized by Article XIV of the Missouri Constitution. 19 C.S.R. 30-95.040(3)(B) provides:

> Cultivation, infused products manufacturing, dispensary, testing, and transportation facilities shall be held by entities that are majority owned by natural persons who have been citizens of the state of Missouri for at least one (1) year prior to applying for a facility license or certification. For the purposes of this requirement, citizen means resident.

To apply for a license, a facility must submit documents showing "the applicant is majority owned by Missouri residents" and submit proof of residency showing they have resided in Missouri for at least one year and do not claim resident privileges in another state. 19 C.S.R. 30-95.025(4)(A)(2); 19 C.S.R. 30-95.040(2)(C). In addition, a licensed facility must request and be granted approval from DHSS anytime it makes "any changes to ten percent . . . or more of the ownership interests of the facility. Its request must include:

> B. An updated Ownership Structure Form, included herein, which must show the applicant entity is majority owned by Missouri residents, and a written description or visual representation of the facility's ownership structure including all entities listed on the Ownership Structure Form; [and]
>
> C. For each owner claiming Missouri residency for purposes of subparagraph B of this paragraph, a statement that the owner has resided in Missouri for at least one (1) year and does not claim resident privileges in another state or country, as well as proof of current Missouri residency, which shall be shown by--
>
> (I) A copy of a valid Missouri driver's license, a Missouri Identification Card, a current Missouri motor vehicle registration, or a recent Missouri utility bill; or
>
> (II) If none of these proofs are available, some other evidence of residence in Missouri, which shall be approved or denied at the discretion of the director of the medical marijuana program as sufficient proof of residency[.]

19 C.S.R. 30-95.040 (4)(C)(2)(B)-(C); *see also* 19 C.S.R. 30-95.040(D).

## III. Discussion

### A. Standing

As a threshold matter, DHSS characterizes Toigo's Complaint as "primarily [alleging] a claim of injury derivative of injuries to [ORMO], a corporation in which Plaintiff is a minority

shareholder." The State asks the Court to disregard any harms suffered by ORMO in evaluating this Motion, since Toigo cannot prosecute a claim on behalf of ORMO under the Shareholder Standing Rule. *See Potthoff v. Morin*, 245 F.3d 710, 716 (8th Cir. 2001) ("[A]ctions to enforce corporate rights or redress injuries to the corporation cannot be maintained by a stockholder in his own name even though the injury to the corporation may incidentally result in the depreciation or destruction of the values of the stock."). (internal citations omitted).

Toigo does not dispute DHSS's application of the Shareholder Standing Rule but points out that "Defendants do not challenge Mr. Toigo's standing to challenge the state's durational residency requirement as an individual applicant" or as an out-of-state resident who wishes to enter the medical marijuana market in Missouri.

For purposes of evaluating this Motion, the Court accepts that Toigo cannot advance claims on behalf of ORMO and will disregard any alleged injuries suffered by ORMO. Toigo has alleged irreparable injuries in that he himself will be unable to apply for a medical marijuana license or increase his ownership share in medical marijuana businesses in Missouri due to the durational residency requirement. These injuries are not derivative of his minority interest in ORMO and thus are not excluded from consideration under the Shareholder Standing Rule.

## B. Likelihood of Success on the Merits

The Commerce Clause empowers Congress "[t]o regulate commerce . . . among the Several States." U.S. Const. art. 1, § 8, cl. 3; *see also Dep't of Re venue of Ky. v. Davis*, 553 U.S. 328, 337 (2008). The dormant commerce clause is the negative implication of the Commerce Clause: It prohibits states from enacting laws "that discriminate or unduly burden interstate commerce." *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003) (citing *Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992)). State laws violate the dormant commerce clause

4

if they require differential treatment of in-state and out-of-state economic actors that benefits the former and burdens the latter unless the regulation is narrowly tailored to advance a legitimate local interest. *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 999 (1994). Courts have applied the dormant commerce clause to marijuana facilities regulated by states that have legalized or partially legalized the drug despite the fact that it remains a controlled substance under federal law. *See NPG, LLC v. City of Portland, Maine*, 2020 WL 4741913 (D. Me. Mar 3, 2020); *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87-88 (1984) (holding the Controlled Substances Act did not grant states the power to burden interstate commerce in substances regulated under the Act).

A state law challenged on dormant commerce clause grounds is subject to a two-step analysis. *Hazeltine*, 340 F.3d at 593. First, the court considers whether the challenged law in fact discriminates against out-of-state economic interests in favor of in-state economic interests. *Id.* A law is considered facially discriminatory when it discriminates against out-of-state interests by its plain terms. *See Chem. Waste Mgm't, Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (characterizing as facially discriminatory an Alabama law that assessed a surcharge for disposal of hazardous waste that was generated outside of state). A law may also be considered discriminatory if it has a discriminatory purpose or a discriminatory effect, even if it is neutral on its face. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (discriminatory purpose); *Maine v. Taylor*, 477 U.S. 131, 148 n. 19 (1986) (discriminatory effect). If the challenged law is found to be discriminatory it is *per se* invalid, and the court moves to the second step of its analysis where it considers whether the state can show that "it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019) (internal quotations omitted); *see also South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2091 (2018)(quoting



*Granholm v. Heald*, 544 U.S. 460, 476 (2005)) ("State laws that discriminate against interstate commerce face a 'virtually per se rule of invalidity.'")

It is not necessary to look beyond the face of the State's durational residency requirement to determine whether it is discriminatory. A law that prevents persons from becoming majority shareholders in Missouri businesses that engage in the cultivation, manufacture, and dispensation of medical marijuana products unless they have lived in Missouri for one year and do not reside in any other state is facially discriminatory against out-of-state economic interests. A law that prevents out-of-state persons from applying for medical marijuana licenses or purchasing them from others is also facially discriminatory against out-of-state economic interests. DHSS in its briefing does not dispute the facially discriminatory nature of the durational residency requirement, which categorically forecloses non-Missouri residents from owning a majority interest in any medical marijuana facility in Missouri.

To survive the resulting presumption of invalidity, *Granholm*, 544 U.S. at 476, DHSS must show the law advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. *Davis*, 553 U.S. at 338 (internal citations committed). These justifications must survive strict scrutiny. *Oregon Waste Sys., Inc.*, 511 U.S. at 101. DHSS proffers two virtually interchangeable justifications for the residency requirement: that it is required to enforce drug laws and that it is required to prevent the illicit diversion of medical marijuana for recreational or out-of-state use. Doc. 21, at 16 (DHSS Sugg. in Opp.).

The recreational use of marijuana remains illegal under Missouri and federal law. In an affidavit, Michael Boger, the administrator of DHSS's Bureau of Narcotics and Dangerous Drugs, has stated that it is a State priority to prevent the marijuana grown for medicinal purposes from being used recreationally or diverted to other states. Doc. 21-3 at 2 (Boger Affidavit). Boger

6

represents that "The ability to conduct thorough background checks plays an important role in preventing revenue from medical marijuana from being diverted to criminal enterprises, gangs, cartels, and black-market areas." *Id.* at 3–4. He states "It is faster and easier to do a thorough background check if an applicant is a Missouri resident because pertinent records are in Missouri and Missouri licensing authorities have access to those records . . . It is easier to obtain Missouri corporate records on file, filings, tax information, and criminal histories than to obtain such records from other states." *Id.* at 4. He states "Missouri state agencies do not always have authority to obtain confidential records from agencies in different states. Sometimes additional waivers or releases have to be obtained and reviewed by legal counsel." *Id.* Essentially, DHSS argues it is necessary to enforce a durational residency requirement because it is "faster and easier" to conduct thorough background checks of Missouri residents which are necessary to ensure that licenses are not being issued to individuals or companies who might divert medicinal marijuana to recreational or out-of-state uses. DHSS casts the residency requirement as "narrowly drawn" to protect its interest in enforcing drug laws and preventing medicinal marijuana from leaving the State.

Although the State has a legitimate interest in enforcing laws concerning controlled substances (including those laws that prevent medical marijuana from being used recreationally or outside its borders), Supreme Court precedent makes clear that categorical durational residency requirements are not narrowly tailored to advance that interest. In *Tennessee Wine*, the Supreme Court considered a Tennessee liquor law that places "onerous durational-residency requirements for all persons and companies wishing to operate 'retail package stores' that sell alcoholic beverages for off-premises consumption." 139 S. Ct. at 2457. Tennessee's durational residency requirement required individuals applying for such a liquor license to demonstrate they had been Tennesseans for at least two years. *Id.* It similarly required corporations applying for a license to

demonstrate that all officers, directors, and owners had been state residents for at least two years. *Id.* The Tennessee Wine and Spirits Retailers Association, defending the state law, argued the durational residency requirement was necessary so that the State could "determine an applicant's fitness to sell alcohol" and guard against "undesirable" non-residents from "moving into the State for the purpose of operating a liquor store." *Id.* at 2475.

The Supreme Court rejected the Association's justification. It held that "The State can thoroughly investigate applicants without requiring them to reside in the State for two years before obtaining a license" through normal criminal background checks or "more searching checks" if necessary. *See also Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994) ("If Texas desires to scrutinize its applicants thoroughly, as is its right, it can devise nondiscriminatory means short of saddling applicants with the 'burden' of residing in Texas."). The Supreme Court was dubious that a residency requirement actually served the law enforcement purpose proffered by the Association. *Tennessee Wine*, 139 S. Ct. at 2475 ("[A]ll that the 2-year requirement demands is residency. A prospective applicant is not obligated during that time to be educated about liquor sales, submit to inspections, or report to the State.") (internal quotations omitted). Finally, the Court pointed out that it had already rejected durational residency requirement for liquor sales in Michigan justified on the grounds of "protecting public health and safety" and "ensuring regulatory accountability" due to "improvements in technology" that have "eased the burden of monitoring out-of-state wineries." *Granholm v. Heald*, 554 U.S. 460, 492 (2005) ("Background checks can be done electronically. Financial records and sales data can be mailed, faxed, or submitted via e-mail."). DHSS does not cite to any instance where a court has upheld as constitutional a durational residency requirement on the grounds that it ensured thorough and easier-to-conduct backgrounds checks of business license applicants.

8

DHSS has proffered a justification that hinges on the idea that it can only investigate the backgrounds of individuals who have lived in Missouri for at least a year. But there is little reason to think that a one-year durational residency requirement would actually ease DHSS's burden in this regard. An applicant could rack up an extensive criminal history and record of financial misdeeds in Kansas, move to Missouri, and one year and one day later apply for a license to operate a medical marijuana facility. It is unexplained how the durational residency requirement would aid DHSS in uncovering this applicant's presumed ineligibility in this circumstance—DHSS does not explain how the task of securing an applicant's out-of-state records would be eased by the simple fact that the applicant had lived in Missouri for the past year. It is also unclear why the State cannot simply require applicants to consent to a criminal background check and disclose their own records. In 2005, the Supreme Court held that monitoring out-of-state activities was not so burdensome a task that it justified a facially discriminatory restriction on out-of-state commerce "due to improving technologies." *Granholm*, 554 U.S. at 492. Sixteen years later, there is even less reason to think that DHSS lacks the technological means to advance its legitimate interest in enforcing its drug laws absent a durational residency requirement. *See Hazeltine*, 340 F.3d at 593 (state must demonstrate it has "no other means to advance a legitimate local interest.").

As to the State's argument that its durational residency requirement is necessary to prevent the illicit diversion of medical marijuana, the Court again acknowledges its legitimate interest in enforcing its drug laws in this regard. However, there are multiple nondiscriminatory means of advancing that interest, many of which the State has already implemented. DHSS currently tracks marijuana seed-to-sale, requires constant video surveillance of all medical marijuana facilities, has given itself a broad right of access to these business's records, and conducts criminal background checks of all facility owners and employees in the industry. *See* 19 C.S.R. 30-95.090 (Seed-to-

Sale Tracking), 30-95.040(2)(F) (background checks), 30-950.070, 30-95.100(2)(D) (video monitoring), *et seq.* DHSS cannot demonstrate that its durational residency requirement is necessary to advance its interest in this regard given the extensive and nondiscriminatory regulations already in place. Furthermore, it is far from clear how a durational residency requirement actually hinders the diversion of medical marijuana away from its intended purpose. It is no easier for a person who has lived in Missouri for less than a year to drive from Missouri to Kansas with medical marijuana in their trunk than it is for a person who has lived in Missouri for a year and a day. And it is no more difficult for a long-time Missouri resident to smuggle marijuana out of the medical system and into the recreational market than it is for anyone else. In this way, the durational residency requirement is not narrowly drawn to advance a legitimate local interest.

DHSS's justification for its durational residency requirement is virtually identical to the justifications offered by the Association in *Tennessee Wine* and Michigan in *Granholm*. In both cases, the Supreme Court held unconstitutional facially discriminatory durational residency requirements grounded in the State's interest in being able to thoroughly assess the background of out-of-state business license applicants. At its core, their cases are grounded in the police power—their inherent authority to enforce the criminal laws and prevent crime. The Supreme Court has been clear that invocation of the police power alone is not enough to overcome the dormant commerce clause. *See Tenn. Wine*, 139 S. Ct. at 2468 ("[T]he commerce clause did not permit the States to impose protectionist measures clothed as police-power regulations."). At this preliminary stage, the State has not demonstrated that the durational residency requirement is narrowly tailored to advance its legitimate interest in crime prevention, much less that it has "no other means" to advance that interest. *Hazeltine*, 340 F.3d at 593. Because Toigo has shown a strong likelihood of success on the merits of his claim, this factor weighs in his favor.

10

**b. Irreparable Harm**

Toigo argues there is a threat of irreparable harmed if a preliminary injunction is not entered because (1) the durational residency requirement is depriving him of a constitutional right; and (2) his economic injuries cannot be compensated through an award of damages. Toigo, citing to *Elrod v. Burns*, 427 U.S. 347 (1976), asserts that the loss or deprivation of a constitutional right automatically constitutes irreparable harm warranting injunctive relief. *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."") (internal citations omitted). However, under Eighth Circuit precedent *Elrod* does not apply "where no First Amendment interests are imperiled." *See Reproductive Health Serv. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1143 (8th Cir. 2005). In non-First Amendment contexts, a movant must demonstrate not only a constitutional violation but that the irreparable harm is certain and "of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not enough. *Roberts v. Van Burden Pub. Sch.*, 731 F.2d 523, 526 (8th Cir. 1984) (internal citations omitted). Finally, in cases where damage claims are barred by the Eleventh Amendment, irreparable harm is presumed so long as the injury itself is not speculative. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). In this case, because all sides agree that claims for monetary damages against the State are barred under the Eleventh Amendment, equitable relief in the form of an injunction is all that remains available for Toigo.

The State claims that Toigo is not faced with imminent harm because even if he were eligible to apply for a medical marijuana license, he has little prospect of receiving one since DHSS has no plans to issue more licenses "any time soon." The State reasons that given the uncertainty surrounding when DHSS will issue new licenses and whether Toigo would receive a newly issued

license even if he were eligible to apply for one, the alleged harm that could result from him being ineligible to apply for such a license is speculative. As to Toigo's desire to become a majority shareholder in ORMO, the State argues this alleged harm is speculative because he has "presented no evidence that other shareholders are willing to transfer any of their shares to him" and "does not assert that he wishes to buy an interest in any medical marijuana facility in Missouri whose license is not held by ORMO[.]" Toigo has stated that if the durational residency requirement were not in effect, he would apply for and/or purchase a medical marijuana license and personally invest in and raise additional capital for ORMO. Doc. 15-1 at 2-3 (Toigo Affidavit).

The State's argument on this point is unpersuasive. It may be true that any given Missouri resident has slim odds of receiving a license to operate a medical marijuana facility "any time soon" because the licenses are not currently being issued and because the number of applications has so far well exceeded the number of available licenses. Yet the fact remains that Toigo's odds of receiving a license are nil so long as he does not reside in Missouri. His chances of ever being able to invest the amount of capital he wishes to invest in ORMO, acquire a controlling stake in ORMO, or acquire a controlling stake in another medical marijuana business in Missouri are similarly nil. If and when DHSS issues new licenses, Toigo's harm will be not speculative but guaranteed in that unlike Missouri residents, he will have no ability to apply for a license and thus no chance of receiving one. The harm resulting from Toigo's inability to purchase an already-issued license or invest in already-licensed businesses (including the business he already partially owns) is immediate and ongoing.

DHSS relies on the fact that Toigo has not applied for a license or arranged to purchase or additionally invest in a medical marijuana concern in Missouri to support its argument that Toigo's harm is speculative. But Toigo cannot fairly be expected to take these actions when he is

categorically barred from doing so by the same durational residency requirement that DHSS enforces. Absent an injunction preventing the enforcement of the durational residency requirement, Toigo's injury from being excluded from full participation in Missouri's medical marijuana industry will be irreparable since money damages are unavailable. Because Toigo has established that he is likely to suffer irreparable harm if a preliminary injunction is not entered, this factor weighs in his favor.

### c. Balance of Harms

Toigo argues the balance of harms tilts in his favor because the durational residency requirement prevents him "from directly or more fully participating in Missouri's medical marijuana marketplace and hinders him from investing more in ORMO or from obtaining additional investors from out-of-state." On the other side, he argues Missouri cannot be harmed by an injunction that prevents it from enforcing an unconstitutional law. *See Little Rock Family Planning Services v. Rutledge*, 397 F.Supp.3d 1213, 1322 (E.D. Ark 2019) ("[A] State has no interest in enforcing laws that are unconstitutional . . . an injunction preventing the State from enforcing [the challenged statute] does not irreparably harm the State.") (citing *Hispanic Interest Coal. Of Ala. v. Governor of Alabama*, 691 F.3d 1236, 1249 (11th Cir. 2012)). The State argues that it will be irreparably harmed if it is enjoined from enforcing its drug laws. For reasons explained above, the Court has determined that the durational residency requirement is likely unconstitutional under the dormant commerce clause. DHSS cannot be irreparably harmed by an inability to enforce an unconstitutional law. *See Little Rock*, 397 F.Supp.3d at 1322; *see also Pavek v. Simon*, 467 F.Supp.3d 718, 762 (D. Minn. 2020). Because the harm inflicted on Toigo if an injunction is not issued outweighs the harm inflicted on DHSS if an injunction is issued, this factor tilts in Toigo's favor.



**d. Public Interest**

Finally, Toigo argues a preliminary injunction would serve the public interest "because it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds in Phelps-Roper v. City of Manchester, 697 F.3d 678 (8th Cir. 2012) (en banc)*. The State responds that the public "has an interest in effective law enforcement, prevention of drug trafficking and criminal enterprise or gang involvement in the controlled substance market, and public safety that weigh in favor of denying a preliminary injunction." The public's interest in preventing criminal activity and ensuring public safety cannot justify the violation of Toigo's constitutional rights to engage in interstate commerce when non-discriminatory means exist to advance those same interests. The public interest is best served by the protection of Toigo's constitutional right to fully participate in the medical marijuana business in Missouri on the same footing as a Missouri resident, a right that is likely being violated by the State's durational residency requirement. *Phelps-Roper*, 545 F.3d at 690. The public interest weighs in favor of a preliminary injunction.

**4. Conclusion**

For the reasons explained above, each of the *Dataphase* factors militates in favor of a preliminary injunction. As such, Toigo has met his burden in establishing the basis for a preliminary injunction. *Dataphase*, 640 F.2d at 114. Toigo's Motion for Preliminary Injunction is granted. Defendants are preliminarily enjoined from enforcing the durational residency requirement in Article XIV, § 1.7(3) of the Missouri Constitution and as promulgated in 19 C.S.R. 30-95.025 and 19 C.S.R. 30-95.040. Pursuant to Fed. R. Civ. P. 65(c), Toigo is ordered to post a bond in the amount of $10,000 to pay the costs and damages sustained by Defendants if it is later found they have been wrongfully enjoined.

14