# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| GEORGIA ATLAS, INC., AND ATLAS ILLINOIS, INC., <br><br> PLAINTIFFS, <br><br> V. <br><br> ANDREW L. TURNAGE, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE GEORGIA ACCESS TO MEDICAL CANNABIS COMMISSION, AND CHRISTOPHER EDWARDS IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE GEORGIA ACCESS TO MEDICAL CANNABIS COMMISSION <br><br> DEFENDANTS. | CIVIL ACTION FILE <br> NO.: 1:21-CV-03520-SDG |

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

COMES NOW GEORGIA ATLAS, INC. and ATLAS ILLINOIS, INC., by and through undersigned counsel (collectively, the "Plaintiff"), and hereby files this Complaint for injunctive and declaratory relief against Andrew L. Turnage, in his Official Capacity as Executive Director of the Georgia Access to Medical Cannabis Commission (the "GAMCC"), and Christopher Edwards in his Official Capacity as Commissioner of the Georgia Access to Medical Cannabis Commission (the "Commissioner"; collectively, GAMCC and the Commissioner are the "Defendants"), and shows the Court as set forth below:

## NATURE OF THE CASE

1. Plaintiff brings this action seeking an temporary restraining order, injunctive relief, declaratory relief, and costs of litigation including, without limitation, attorneys' fees, against

the Defendants, because of the Defendants' wrongful and illegal actions taken in regards to the issue of certain licenses for the production of low THC oil in violation of the federal and state law.

## PARTIES

2. Georgia Atlas, Inc. is a domestic corporation and resident of the State of Georgia; it's sister corporation and affiliate, Atlas Illinois, Inc. is an Illinois corporation.

3. Andrew Turnage is an appointed official serving as the Executive Director of the GAMCC.

4. Christopher Edwards is the head of GAMCC, appointed by Governor of the State of Georgia and charged with directing the GAMCC in its implementation of the Hope Act.

5. All of the Defendants may be served at their respective government offices located within the Northern District of Georgia.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 1343 (US Constitution). This Court also has authority to grant declaratory relief under 28 U.S.C. § 2201 and 2202. Court has pendent jurisdiction and supplemental jurisdiction over any state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

7. Venue properly lies in the Northern District of Georgia pursuant to 28 U.S.C. §1391.

## FACTS

8. On April 2, 2019, the Georgia General Assembly passed House Bill 324 titled "Georgia's Hope Act" (the "Hope Act"), which created and authorized the Georgia Access to Medical Cannabis Commission to oversee the licensing of limited in-state cultivation, production,

manufacturing, and sale of low THC oil to registered patients on the state's low THC oil registry.

9. The governor signed the Hope Act into law on April 17, 2019. Georgia's Hope Act (Official Code of Georgia Annotated §16-12) took effect July 1, 2019 and administratively attached the GAMCC to the Office of the Georgia Secretary of State. See O.C. G. A. § 16-12-202, § 50-4-3.

10. Appointed in November of 2019, the seven person commission were all appointed by high ranking Georgia republicans -- the commissioner and two members were appointed by the governor, two members were appointed by the lieutenant governor, and two members appointed by the speaker of the house. The Georgia General Assembly appropriated funds to GAMCC as a new government agency in late 2019. GAMCC then selected an Executive Director in May of 2020.

## Purpose of the Hope Act

11. From an excerpt from House Bill 324 (2019), the purpose of the Hope Act is:

    The General Assembly finds that the establishment of the Low THC Oil Patient Registry in 2015 allows Georgia patients to possess low THC oil but provides no way to access low THC oil. The General Assembly finds that thousands of Georgians have serious medical conditions that can be improved by the medically approved use of cannabis and that the law should not stand between them and treatment necessary for life and health. The General Assembly finds that the purpose of this Act is to allow the legitimate use of medical cannabis for health care, including palliative care. The General Assembly finds that this Act does not in any

way diminish this state's strong public policy and laws against illegal drug use, nor should it be deemed in any manner to advocate, authorize, promote, or legally or socially accept the use of marijuana for children or adults for any non-medical use.

The General Assembly further finds that:

(1) Low THC oil can offer significant medical benefits to patients;

(2) Low THC oil can only be derived from the cannabis plant;

(3) A carefully constructed system of in-state cultivation to benefit only those patients authorized by Georgia law and approved by their physician would benefit patients within the State of Georgia;

(4) The State of Georgia is deeply opposed to any recreational or non-medical use of marijuana, and any system to help patients access low THC oil should be as limited in scope as possible;

(5) Business opportunities resulting from a system of in-state cultivation should be inclusive of minority, women, and veteran owned businesses;

(6) Businesses resulting from this Act should include at least 20 percent participation by minority, women, and veteran owned businesses as licensees, suppliers, and partners of businesses licensed under this Act; and

(7) The State of Georgia should encourage active participation by minority, women, and veteran owned businesses, as well as take any steps necessary to ensure there is no discrimination in the issuance of licenses or participation in business activities resulting from this Act.

12. However, despite the lofty goals of the Hope Act, its actual implementation fell far short of what was allegedly "intended" by the Georgia General Assembly.

13. Specifically, the implementation of the Hope Act has been hampered by the misconduct of various parties whose objectives appear not to be aligned with those enunciated in the Hope Act. And it appears that the Hope Act's passage was mired by several secretive "back room" deals. See www.gpb.org/news/2021/08/20/georgia-today-states-opaque-licensing-process-has-marijuana-companies-crying-foul.

14. First and foremost, upon information and belief, GAMCC was intentionally and woefully underfunded. Not counting the 7 commissioners, who all serve as volunteers, GAMCC has only *one employee*, an all purpose support person who serves all of the GAMCC's administrative functions. See GAMCC Budget Report 2021 and Transcript of GAMCC's July 24, 2021 meeting in Rock Spring, Georgia.

15. The lack of funding resulted in numerous delays, and undoubtedly contributed to the multitude of issues plaguing the GAMCC's attempted implementation of the Hope Act. See https://www.gpb.org/news/2021/06/14/impatience-grows-over-pending-medical-marijuana-licenses.

16. Indeed, even under normal circumstances, creating a proper procurement system is a difficult task, since Georgia law requires that public procurements ensure fair and equitable treatment of all who deal with the procurement system of the state, and provide safeguards for maintaining a procurement system of quality, transparency and integrity.

17. For example, it is hornbook law that government agencies, among other things, must evaluate proposals and make awards based on the criteria explicitly stated in the solicitation.

18. But here, the intentional lack of funding for GAMCC provided the opportunity for many of the acts complained of herein, and prevented much of the transparency, organization, promulgation of evaluation criteria, and consistency that Georgia and federal law require.

19. But more than that, the Defendants appear to have anticipated malfeasance with the implementation of the Hope Act, and upon information and belief, this was the reason that the Hope Act specifically excludes applications submitted to the Defendants from being subject to the Georgia Open Records Act.

20. However, the scope and depth of the problems with the implementation of the Hope Act did not become apparent until after the GAMCC announced the winners, and the public was able to see some parts of the winning and losing applications.

21. In hindsight, it all began on the eve of the applications being due — December 22, 2020 — when one of the applicants, and ultimately a winner of a Class 1 license, Trulieve GA, Inc. ("Trulieve"), filed an untimely and frivolous challenge[1] to the Georgia residency and minority participation requirements of the Hope Act.

22. Despite the protest being laughably untimely, GAMCC strangely "suspended" the application process to consider the protest filed by Trulieve. However, upon information and belief, the untimely and frivolous challenge, and the subsequent suspension of the application due date, was simply a delay measure to allow Trulieve to comply with the Hope Act's residency requirement and minority "participation" requirements.

---

[1] Upon information and belief, due to funding issues, the GAMCC lacked the ability to actually evaluate the protest internally, and so it asked the other applicants to respond to Trulieve's protest. The GAMCC solicited responses to Trulieve's protest, and every response noted that the protest was untimely and frivolous.

23. According to the Georgia Secretary of State, Trulieve was formed via a merger with a Georgia development company, DESIGN SELLUTIONS, INC., on December 28, 2020.

24. Likewise, upon information and belief, around that same time, Trulieve made a rather large donation to the Commissioner's *alma mater* and where he serves as a Board member, Morehouse School of Medicine, to demonstrate its "dedication" to the local community and minorities.

25. Oddly, shortly after the merger and the donation to Morehouse School of Medicine, Trulieve abruptly withdrew its protest — and ultimately, submitted an application that won a Class 1 license.[2]

26. The wrongful delay of the process prejudiced those applicants whose applications were completed on time and did not need the additional delay.

27. After the withdrawal of the Trulieve protest, the GAMCC then required about 6 months to evaluate approximately 70 applications — all of which involved exceptionally technical and rarified areas of inquiry — without the help of third party experts or other external guidance.

28. None of the commissioners on the GAMCC possess the expertise or knowledge to evaluate the minutiae of many parts of the applications for licenses — e.g., security plans or manufacturing requirements for low THC oil.

29. Moreover, once the winners were announced on July 24, 2021 — it became clear that the GAMCC also lacked any sort of consistent evaluation criteria for the applications.

---

[2] A founder of Trulieve GA's parent company was recently (August 13, 2021) convicted in federal court of bribery and corruption charges in that companies obtaining of a Florida license to grow and sale medical marijuana. See https://www.justice.gov/usao-ndfl/pr/john-thomas-burnette-convicted-five-counts

30. Of the dozen or so protests filed by losing applicants, each identified numerous areas where the Defendants arbitrarily scored applications using a ridiculous quarter system, where points were awarded in increments of 25.

31. Indeed, it appears that even on "objective" questions, such as those regarding "Georgia residency", there are inconsistencies. The application requested the same basic documents from every applicant – i.e., Articles of Incorporation, Federal EIN, and state tax ID – yet different applicants received different scores for the same basic, boiler plate documents. However, the amount of time as a Georgia resident did not appear to affect the distribution of scores, with some companies, including winners, having been formed slightly before the application deadline and yet received full scores. This arbitrariness directly affected Plaintiff's relative score to certain winners, and because Plaintiff formed an actual, legitimate Georgia company, Plaintiff incurred greater costs than winners who formed a "domestic" corporation at the last minute.

32. Furthermore, besides the inconsistencies in scoring, there were also missed rule violations.

33. For example, in the case of Natures GA, LLC ("Natures GA"), despite guidance to the contrary, the Defendants did not disqualify Natures GA's application, although the company's affiliates had been sanctioned for violations of Connecticut's medical marijuana program.

34. In addition, Natures GA grossly exaggerated the number of employees for its production facility at between 221 and 430 employees — but because the GAMCC lacked the formal expertise to evaluate the applications, it appears that the GAMCC either did not catch or penalize Natures GA for this inconsistency.

35. Another license winner, Botanical Sciences, Inc. ("Botanical Sciences"), was so confident of obtaining a license, that it has already purchased property to build its facility; however, upon closer review, the proposed facility violates the explicit requirement under the GAMCC that no marijuana production facility be within 3000 feet of schools, churches, and other "protected" areas. Upon information and belief, the GAMCC did not penalize Botanical Sciences for having its proposed facility too close to a church.

36. Notwithstanding the aforementioned issues, many applicants, including Plaintiff, also submitted the same application for both a class 1 and a class 2 license; however, a brief review of the scoring shows that despite submitting the same application, sometimes the application received the same score for both the class 1 and class 2 license, such as with Pure Beauty, but others got different scores for the same application - e.g., TheraTrue Georgia, and Natures GA.

37. Furthermore, the Hope Act allowed the GAMCC to contact the top 12 applicants for additional screening and negotiation, but despite Plaintiff and others, being in that group, upon information and belief, no one received any additional permitted contact or vetting with the GAMCC after the initial submission of applications.

38. Nevertheless, upon information and belief, there appear to have been private meetings with at least one other applicant and the Defendants, during the "no contact" portion of the evaluation process.

39. Lastly, despite the clear mandate in the Hope Act that license recipients be bona fide Georgia residents, at least five of the six license winners were formed just before the application due date, with significant out of state ownership.

40. Indeed, the one winner that does not already have operations in effect in other states, Botanical Sciences, does not even have an operational website, but it did have on its board of directors, Tom Price, long time opponent of low THC oil, but well connected republican politician. Moreover, it is worth noting that the highest graded application for BOTH classes was not one of the established, multi-state applicants with operations across multiple states, but the application of Botanical Sciences.

41. Moreover, it appears that at least one of the Commissioners has recently come under investigation for illegal activity, including, upon information and belief, embezzlement of funds. See https://www.fox5atlanta.com/news/georgia-medical-marijuana-commissioner-removed-following-i-team-report-of-a-gbi-investigation.

42. Indeed, most of the points that Plaintiff lost on its application were deducted by the Commissioner currently under investigation by the GBI, and ultimately "removed" from the GAMCC.

## CAUSE OF ACTION I
### 42 U.S.C. §1983 (Due Process)

43. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein in full.

44. The 14th Amendment to United States Constitution requires that no one may be deprived of life, liberty, or property, without due process of law.

45. Pursuant to the Hope Act, the Plaintiff expended significant amounts of time, effort, and money to apply for a license to produce low THC oil in Georgia – relaying on the stated purpose and goals of the Hope Act.

46. However, acting under the color of law, the Defendants violated the Plaintiff's constitutional rights by intentionally failing to properly implement the Hope Act, as outlined above, and thereby, wrongfully denied Plaintiff a license under the Hope Act.

47. The application process was utterly lacking in the transparency, objectivity, and fairness required by the Georgia Procurement Act. In fact, the Defendants failed to even employ blind grading of the applications; moreover, the Defendants made the process not subject to Open Records Act to further obfuscate the license awarding process. In addition, at least one of the Commissioners, who was influential in scoring Plaintiff's application, has now been removed from the GAMCC.

48. For example, on Schedule F, Letters of Support, the Plaintiff was docked almost 70% of the possible point total because the Plaintiff failed to make any charitable contributions to any local organizations. This "requirement" was not contained in any part of the Hope Act or guidance from the Defendants, so there was no way that Plaintiff could respond to it in the manner that the scorer apparently envisioned.[3]

49. When Plaintiff approached several of the "partners" that the winning applicants identified in their applications, Plaintiff was explicitly informed that it was a "pay to play" system, if Plaintiff wanted to actually win a license. The partnerships that the Plaintiff ultimately formed with educational partners was a bilateral agreement to conduct genuine research, not an illusionary partnership premised on a large donation.

---

[3] However, it should be noted that Trulieve apparently knew that a financial contribution was required for this section, as it donated $1M to certain entities related to the Defendants.

50. In addition, the grading of applications seems to have been arbitrary, at best, or prejudicial at worst, with the residency criterion explicitly asking for three documents to establish residency, but various applicants getting significantly different results, despite all submitting the exact same documents.

51. These grading inconsistencies matter, because the scoring among the top applicants was relatively tight, and certain scoring increments are set for 25 points, so that even a minor change on the Plaintiff's application, or a reduction in a winner's application, or in some cases, a disqualification, elevates the Plaintiff into position to receive a class 2 license. See Score Tables attached hereto as Exhibit A.

52. In addition, the Defendants' made rule changes without notice to the Plaintiff. Specifically, the Plaintiff expended significant resources to craft a corporate ownership structure and management team that included women. However, after the Plaintiff prepared its application, the Defendants arbitrarily excluded "women" from the definition of "minority", and generally devalued the Hope Act's explicit focus and insistence on minority participation as a significant factor in the awarding of licenses.[4]

53. But for the Defendants' wrongful actions, including, without limitation, (i) the failure to establish, publish, and employ standardized evaluation criteria for the applications, (ii) the failure to employ blind grading, (iii) the failure to preserve the transparency of the license awarding process, (iv) the appearance of impropriety due to certain inconsistencies in scoring applications, and (v) the changes to the rules after the applications had been submitted, the

---

[4] The Hope Act also excludes Native Americans from the definition of "minority", and Plaintiff has Native Americans in its ownership and management structure.

Plaintiff would have received a license; and as a result of the actions of the Defendants, the Plaintiff has suffered and will suffer irreparable injury for which it has no adequate remedy at law.

54. WHEREFORE, for the acts described in this Complaint, Plaintiff is entitled to (i) a declaration that the Defendants' acts related to the Hope Act violates Plaintiff's right to procedural and substantive due process under the US Constitution, or in the alternative, that the Hope Act is unconstitutional, (ii) an injunction enjoining further implementation of the aforementioned policies, or in the alternative, the Hope Act in its entirety, and (iii) whatever additional relief the Court deems just and proper.

### CAUSE OF ACTION II
### 42 U.S.C. §1983 (Equal Protection/Commerce Clause)

55. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein in full.

56. The 14th Amendment to United States Constitution requires that all persons are entitled to equal protection under the law.

57. However, acting under the color of law, the Defendants violated the Plaintiff's constitutional rights by intentionally drafting and implementing the Hope Act in a manner which discriminated against certain groups, and thereby, wrongfully denied Plaintiff a license under the Hope Act. Or, in the alternative, the Hope Act, on its face, discriminates against certain groups.

58. Despite the Hope Act specifically requiring the GAMCC to prioritize minorities and domestic companies for licenses, the Defendants actually gave greater weight and priority to companies

that were not bona fide domestic corporations, as evinced by the winning applications.[5] Of the six license winners, at least five are clearly out state entities owned by non-Georgians or part of a multi-state conglomerate.

59. Indeed, Plaintiff (Atlas Illinois, Inc. and Georgia Atlas, Inc.) had to essentially divide itself and its resources, as well as, recruit new owners and managers from Georgia, to apply for a license in Georgia due to the Hope Act's residency requirement. And obviously, Atlas Illinois was not even allowed to apply for a license, despite being the stronger of the affiliated companies.

60. But not only was the residency requirement the source of arbitrary grading of the applications, it also served as a basis for discrimination.

61. Under federal law, a state law that discriminates against interstate commerce on its face "invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." See Hughes v. Oklahoma, 441 U.S. 322, 337 (1979); *see also* Camps Newfoundland/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 581 (1997) (explaining that strict scrutiny of a law that facially discriminates against non- residents "is an extremely difficult burden, so heavy that facial discrimination by itself may be a fatal defect")

62. Likewise, despite the Hope Act's mandate to the contrary, none of the winners are majority minority owned, only one winner appears to have meaningful minority presence in its

---

[5] The Defendants have indicated on several occasions, including at the July 24 meeting, that the most important factor in evaluating applications was the perceived ability to "get the product to the market quickly and effectively" – which existing companies, with on going production facilities, would obviously be able to achieve.

owner/management structure. Conversely, at great expense, Plaintiff was designed to incorporate significant minority participation in its ownership and management.

63. Finally, the Defendants also seemed to discriminate and award licenses to applicants that possessed improper relationships with the Defendants. For example, at least one of the successful applicants had significant personal and business ties with members of the GAMCC, or to third parties strongly affiliated with the Defendants. Moreover, it also appears that prior consultants to the Defendants also ultimately won a license, despite vowing not to seek a license. See https://www.fox5atlanta.com/news/many-question-why-georgia-cannabis-commission-is-exempt-from-open-records

64. Indeed, the highest ranked application in BOTH class 1 and class 2 was not one of the applicants affiliated with large, multi-state operations, but belonged to a startup, Botanical Sciences -- a company that does not even have a website or any on going operations outside or inside of the State of Georgia, other than its affiliation with certain politically connected members of the Georgia legislature.

65. There is no rational basis for any of the discriminatory practices and policies employed by the Defendants. Moreover, if the Defendants had employed the most obvious of fairness tools, e.g., blind grading – much of the discrimination noted herein presumably could not and/or would not have occurred.

66. And but for the Defendants' wrongful actions – e.g., preferring fake domestic corporations tied to larger, out of state entities over genuine Georgia corporations -- the Plaintiff would have received a license; and as a result of the actions of the Defendants, the Plaintiff has suffered and will suffer irreparable injury for which it has no adequate remedy at law.

67. WHEREFORE, for the acts described in this Complaint, Plaintiff is entitled to (i) a declaration that the Defendants' acts related to the Hope Act violates Plaintiff's right to equal protection under the US Constitution, or in the alternative, that the Hope Act is unconstitutional, (ii) an injunction enjoining further implementation of the aforementioned policies, or in the alternative, the Hope Act in its entirety, and (iii) whatever additional relief the Court deems just and proper.

**CAUSE OF ACTION III**
**REQUEST FOR EQUITABLE RELIEF**
**(SUPREMACY CLAUSE/PREEMPTION)**

68. Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein in full.

69. This Court possesses powers in equity to address conflicts between federal and state law.

70. The Supremacy Clause of the US Constitution, in conjunction with the Commerce Clause, afford the federal government the right to regulate not just interstate commerce, but also intrastate commerce.

71. Indeed, the Controlled Substances Act ("CSA") currently forbids the growing and cultivation of marijuana. See 21 USC 2010.

72. Similarly, federal law prohibits state laws which discriminate against out of state participants, where interstate commerce is involved.

73. The Hope Act impermissibly contradicts with the CSA in that it permits the growing and distribution of an illegal substance.

74. Conflicts between federal and state law must, with very limited exception, are resolved by the state law being preempted by the federal law.

75. Congress has not excluded the ability of private citizens to request equitable relief based on the Supremacy Clause or the CSA.

76. Despite this conflict in laws, the Plaintiff has, and intends, to expend significant resources to apply for a state law based license that conflicts with federal law. Without such clarification, Plaintiff may be unable to even use its license, should Plaintiff ultimately receive a license. As such, Plaintiffs have suffered irreparable harm and injury, with no adequate remedy at law.

77. Likewise, the Hope Act impermissibly affects interstate commerce, as well as, intrastate commerce – e.g., the Hope Act's facial preference for domestic applicants, but practical discrimination against domestic applicants. And it attempts to implement a state legal scheme that contains elements that violate federal law.

78. WHEREFORE, based on the acts described in this Complaint, Plaintiff requests a declaratory judgment from the Court regarding the validity of the Hope Act, in light of the CSA and the Supremacy Clause, as well as, the Hope Act containing provisions, e.g., the residency requirement – that clearly violate federal law. And depending upon the Court's determination, an injunction enjoining further implementation of the Hope Act due to its numerous conflicts with federal law.

**GENERAL PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment in favor of Plaintiff and against the Defendants, as follows:

(A) That process issue and service be made according to law;

(B) That this Complaint be served upon Defendants in accordance with law;

(C) For a declaration that the Defendant's acts complained of herein are unlawful under federal and state law;

(D) For a declaration that the Hope Act is unconstitutional on its face and as implemented;

(E) For the entry of an injunction ordering the Defendants to cease all actions related to Hope Act until the policies complained of herein are corrected;

(F) For an award of all Plaintiff's expenses and costs in preparing applications for the Hope Act, costs of litigation, including without limitation, attorneys' fees; and

(G) For all other relief the Court deems just and proper.

Respectfully submitted this 20th day of December 2021.

TAYLOR LEE & ASSOCIATES LLC

6855 Jimmy Carter Boulevard  
Building 2100, Suite 2150  
Norcross, Georgia 30071  
Telephone: (770) 650-7200  
Facsimile: (678) 735-4512  
Email: jerome@htlweb.com  
Attorneys for the Plaintiff

/s Jerome Lee  
Jerome D. Lee  
Georgia Bar #: 443455

**Exhibit A**

| CLASS 1 APPLICANT | VALIDATED SCORE |
|---|---|
| Aspire Medical Partners LLC | 851.25 |
| Botanical Sciences LLC | 970 ** |
| Curaleaf GA Holdings LLC | 827.5 |
| Georgia Atlas Inc | 838.75 |
| Natures GA LLC | 882.5 |
| TheraTrue Georgia LLC | 895 |
| Treevana Remedy Inc | 870 |
| Trulieve Ga Inc | 933.75 ** |

**Winners

| CLASS 2 APPLICANT | VALIDATED SCORE |
|---|---|
| Aspire Medical Partners LLC | 851.25 |
| Botanical Sciences LLC | 970*** |
| Curaleaf GA Holdings LLC | 827.5 |
| FFD GA Holdings LLC | 893.75** |
| Georgia Atlas Inc | 838.75 |
| Georgia Grow Solution LLC | 813.75 |
| Natures GA LLC | 876.25** |

| | |
|---|---|
| Peach Health Alternatives LLC | 832.5 |
| TDS Consulting Services LLC | 857.5 |
| Theratrue Georgia LLC | 888.75** |
| Treevana Remedy Inc | 870** |

** Class 2 Winner
*** Class 1 Winner (Ineligible for a Class 2 license)